[Civ. No. 2913. Third Appellate District.—December 26, 1925.]

CALIFORNIA CANNING PEACH GROWERS (a Corporation), Appellant, v. SHERIDAN DOWNEY, Respondent.

[1] CONTRACTS—CO-OPERATIVE MARKETING—CONTROL OF CROPS—INTENT AND PURPOSE.—In this action by a co-operative corporation against a grower to recover liquidated damages on account of alleged violation of the terms and conditions of a fruit-marketing agreement, the several provisions of the agreement showed that the whole intent and purpose of the plan of operation were that all of the members should stand upon an equal basis, bearing an equal proportion of the expenses of maintaining the corporation, marketing the crops and then share upon the same basis in the proceeds available for distribution, based upon the several grades of fruit raised by the different growers; and to accomplish those purposes it was necessary that said corporation have practically absolute control of the disposition and marketing of the fruit raised by the members.

[2] ID. — TITLE TO FRUIT — CONSIGNMENT TO CANNING COMPANY — AUTHORITY TO RELEASE GROWER. — Where, by the terms of such marketing agreement, and for the more effectual purpose of carrying out the objects of the co-operative corporation, the title to all the fruit of the members was vested in said corporation, and consent to any other method of distribution than that set forth in the marketing agreement was required to be had from said corporation, a canning company with which said corporation had placed a certain grower's fruit to be handled on a co-operative

---

1. Co-operative marketing of farm products by producers' associations, notes, 25 A. L. R. 1113; 33 A. L. R. 247.

basis had no authority to release the fruit of said grower from the marketing agreement with the corporation.

[3] ID. — PRIVATE SALE BY GROWER — ACCOUNTING TO CORPORATION — DIVISION OF PROCEEDS.—The marketing agreement having required a full accounting of the proceeds of sales made by growers of *released crops or released portions of their fruit, so that the* members of the corporation would be upon an equal footing and not be disadvantaged by reason of such released sales, a grower of a released crop was required to account to the corporation for the sale by him of said released crop at an advanced price and was only entitled to receive as his proportion, after the accounting, the average price received by other members of the corporation for the sale of a like quality and quantity of their fruit; and an offer by the grower of said released crop to pay to the corporation the maximum percentage prescribed by the marketing agreement to be deducted by the corporation to cover cost of receiving, handling, storing, advertising, marketing, and other expenses, did not meet the accounting requirements of said agreement.

[4] ID.—PARTIES TO AGREEMENT—INTEREST OF MEMBERS—AUTHORITY OF CORPORATION TO WAIVE OR RELEASE. — Such marketing agreements are essentially to and with all the other members of the co-operative corporation, and the interests of every member must rest upon the same foundation, and no member can be advantaged to the detriment of any other member; and where the marketing agreement provides that all the other members of the co-operative corporation have an interest in the proceeds received from the sale of a released crop, they are entitled to share therein and to have the prices for their own crops enhanced to the extent of any sum which the grower of the released crop may have secured by reason of a sale made outside of the dealings of the corporation, and this interest the officers of the corporation could not waive or release; and each member of the corporation must be held to have full knowledge of all this, where the marketing agreement sets forth all these facts in equalizing burdens and advantages.

[5] ID.—ABSENCE OF AUTHORITY TO RELEASE—KNOWLEDGE OF GROWER —ESTOPPEL.—Where the marketing agreement was such that the canning company with which the co-operative corporation had placed a certain grower's fruit to be handled on a co-operative basis had no authority whatever to execute a release of the fruit of said grower from the marketing agreement with the corporation, of which fact said grower must have had full knowledge, said grower could claim a release of his fruit predicated upon estoppel based upon the facts the secretary of the corporation had written him to the effect that his fruit had been "sold" to said canning company and thereafter said canning company, while indicating that it did not consider itself in a position to grant any release, ex-

pressed a willingness to do so and that it would make no difference to them.

[6] ID. — NOVATION — ABSENCE OF ESSENTIAL REQUISITES. — In this action by a co-operative corporation against a grower to recover liquidated damages on account of alleged violation of the terms and conditions of a fruit-marketing agreement, defendant's allegation of a novation was without merit where the evidence showed a previous valid obligation, but did not show the agreement of all the parties to any new contract, or the extinguishment of the old contract, or the validity of the new one, all of which were essential requisites.

(1) 2 C. J., p. 998, n. 31 New.   (2) 2 C. J., p. 998, n. 31 New.
(3) 2 C. J., p. 998, n. 31 New.   (4) 2 C. J., p. 998, n. 31 New.
(5) 2 C. J., p. 998, n. 31 New; 21 C. J., p. 1126, n. 51, p. 1129, n. 54.
(6) 29 Cyc., p. 1131, n. 14, p. 1137, n. 51 New, p. 1139, n. 68.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Reversed.

The facts are stated in the opinion of the court.

Hadsell, Sweet & Ingalls for Appellant.

Downey, Downey & Seymour for Respondent.

PLUMMER, J.—Action by plaintiff to recover liquidated damages from the defendant Sheridan Downey on account of alleged violation of the terms and conditions of a certain fruit-marketing agreement entered into between the plaintiff and the defendant Downey on or about the seventeenth day of April, 1923. The defendant had judgment and the plaintiff appeals. Leaving all the allegations of the plaintiff's complaint uncontroverted, the defendant sets up in his amended answer: "that the plaintiff notified the defendant that his peaches for the year 1923 had been sold to Smith-Frank Packing Company, a corporation, and that thereafter and on or about the 25th day of July, 1923, the defendant secured from said Smith-Frank Packing Company permission to ship his peaches to and sell said peaches in the eastern market."

The testimony set forth in the transcript alleged to be insufficient to support the findings in favor of the defendant is as follows:

6. See 20 Cal. Jur. 248.

On or about the sixteenth day of July, 1923, the plaintiff, by its secretary, forwarded to the defendant Downey a letter in the words and figures as follows:

"July 16, 1923.

"Sheridan Downey,

Sacramento, California.

"Dear Sir:

"We beg to advise you that we have sold to Smith-Frank Packing Company your crop of canning peaches based on your estimated tonnage as follows:

26 tons of new variety midsummers
82 " " Phillips

"Peaches to be delivered at Manlove.

"Yours very truly,

"CALIFORNIA CANNING PEACH GROWERS.

"F. S. SCHMITT,

"Asst. Secty."

About a week subsequent to the receipt of this letter the defendant had a conversation with a Mr. Humphrey, representing the Earl Fruit Company and learned that there was a possibility of obtaining a little better price for the fruit by shipping his crop through the Earl Fruit Company on a commission basis to eastern markets. Thereafter, and on or about the twenty-fifth day of July, 1923, the defendant Downey called up Smith-Frank Packing Company and had the following conversation:

"On the morning I called up the Smith Frank Packing Company and I asked for D. L. Smith with whom I had dealt previously in matters; he was not there; then I asked for Mr. Temple Smith who was the executive officer of the Smith Frank Packing Company; I asked Mr. Temple Smith if it would injure him in any way for me to ship my peaches to the eastern market, and, if it would not I would appreciate it very much, their releasing my peaches; Mr. Smith was very courteous to me and said: 'Mr. Downey, we have absolutely no objection to releasing you, if you can make more money—if you can do it by shipping your fruit, but,' he said, 'I do not believe I have any authority to release you from your contract with the Canning Peach Growers'; I said. 'Well, Mr. Smith, the Peach Growers have sold my peaches to you,' he said, 'If that is so I have no information to that effect'; and I said, 'Well, Mr.

Smith, I know it must be so because I have their letter on my desk; I am looking at it now'; Mr. Smith says, 'Well, that is rather mysterious, it had not been brought to my attention, but my brother has been handling these matters of the fruit, I do not know much about it'; and I said, 'Well, under those circumstances then, have you any objection to my selling my fruit in the East?' Mr. Temple Smith said, 'No, as far as I am concerned I am glad to release you,' and said, 'I do not know—I do not think that the association would in any way object,' and I said, 'You, of course realize they pay more for peaches than canned goods in the eastern markets'; he said, 'Yes, I think that is true, while we have all we can handle, we will be glad to accommodate you.' "

Mr. Downey, on cross-examination, testified in part as follows:

"Now, in this conversation with Mr. Temple Smith was anything said as to what would be done by the Smith Frank Packing Company to get a release from their obligation to buy the peaches which were bought, under your assumption from the California Canning Peach Growers? A. Nothing that I can recollect now. Q. In other words, so far as the conversation over the telephone was concerned, about their getting a release from their obligation to the association? A. Nothing was said by Mr. Temple Smith, but I said then to Mr. Temple Smith, that as long as they were refusing orders from the organization, I am entirely willing to pay the association the commission that they charged for handling those peaches. Q. Of course, that is not a question of commission; all I want to know is the further conversation. A. That was all that was said. Q. Was anything said between you that you would get their release from any obligation to the association? A. No, sir. Q. Was there anything further said in case the association insisted on them buying the peaches— A. No. Q. Nothing of that kind? A. No, sir."

Temple Smith's version of this conversation, as shown by the transcript, is as follows:

"A. Mr. Downey called up on the phone, he asked me if we would object to him shipping Tuscan peaches to the eastern market; I said, 'Mr. Downey, we have no jurisdiction over those peaches'; he said, 'Why you know I ex-

pressed a preference to deliver to you, don't you'; I says, 'Yes,' and I said, 'We have never . . . your expressed preferences has not been confirmed by a sale of those peaches,' then I said, 'In as much as we have not confirmed them, that is tentative.' 'Well,' he said, 'I have been notified by the association my peaches have been assigned to you'; I said, 'That is news to me, we have not received any such notification.' He says, 'Have you any objection to my shipping peaches?' I said, 'Mr. Downey how can I object, we never purchased the peaches, we have not purchased one peach at all.' . . . I forget now whether that was all the conversation or not, but I said, 'In the nature of,' I told him that he had better see the association about it, that we could not possibly object because we had nothing to do with them. Then he said finally, 'Well, you have no objection to my shipping the peaches'; I said, 'No, I have no right to, because I cannot.' That was all the conversation.''

On the same day the defendant forwarded to the Smith-Frank Packing Company a letter as follows:

"Sacramento, July 25, 1923.

"Smith-Frank Packing Company,
    Sacramento, California.

"Gentlemen: Confirming my oral conversation over the telephone with your Mr. Temple Smith, Tuesday, in the event the California Canning Association sells to you my peaches from the Manlove Ranch, I am to have the right to ship what portion of the crop I desire for other purposes than canning, upon the understanding that I shall notify you promptly as to what portion of the crop shall be reserved for your cannery. I wish to thank you for your courtesy in this matter, and express my appreciation of your liberal attitude.

"Yours very truly,
"SHERIDAN DOWNEY."

After dictating and forwarding this letter the defendant again called up Mr. Humphrey and entered into an agreement with him for the shipment of defendant's peaches by the Earl Fruit Company to the eastern markets.

On the twenty-sixth day of July, 1923, the Smith-Frank Packing Company wrote and forwarded the following letter to the defendant:

"July 26, 1923.

"Mr. Sheridan Downey,
        Capital National Bank Building,
            Sacramento, Calif.

"Dear Sir: Replying to your letter of the 25th, beg to advise that the writer does not know just what understanding our Mr. Temple Smith had with you, but we hasten now to advise you that you must not take any statement from us in regard to shipping your peaches, as final, because we are not the ones to get the authority from. The peaches, as you know, have been pooled through the California Canning Peach Growers Association, and they are the ones that have the final disposition of your peaches, therefore, we beg to advise that these are the people whom you should address in the matter.

"The writer believes that it was only the intention of our Mr. Temple Smith to tell you that if you got the permission of the Association, we would not object to your shipping the peaches.

"The writer is unable to take this up with our Mr. Temple Smith at the present time, because he is out of town.

                                "Very Truly Yours,
                        "SMITH-FRANK PACKING COMPANY.
                                        "D. L. SMITH."

On the twenty-seventh day of July, 1923, the canning company forwarded to its members, including the defendant, the following circular letter relative to the handling of peaches for the year 1923:

(Letter-head of the California Canning Peach Growers.)
                        "244 California Street,
                        "San Francisco, California.
                                "July 27th, 1923.

"To All Members:

"In order to place the entire tonnage of cling peaches before handled through the Association, it became necessary that we place a quantity with canners on a co-operative basis. The tonnage being canned co-operatively will approximate 12,000 tons.

"So that members will know the way in which we are handling the matter, we have placed all the cling peaches that are being handled through the Association of the

#1 grade in one pool, all #2 cling peaches in one pool, Lovells in one pool and other Freestones in one pool.

"The members delivering to canners · who are packing for the Association on a co-operative basis, will participate proportionately in any moneys received from canners to whom we sold for cash, and the growers whose crops have been sold to canners on a cash basis will participate proportionately in any returns we may receive from the tonnage placed on a co-operative basis. In other words, all the net proceeds we receive from cash sales sources, and the co-operative sources are pooled together. As an illustration, if our deliveries for the week including cash sales and tonnage delivered to co-operative canners will total one thousand tons of #1 Tuscan cling peaches, for which we will receive in total $10,000.00 then every member who delivered that week would receive $10.00 a ton.

"As regards payments, it has been deemed advisable that payments to members be made on the basis of $15.00 per ton on #1 cling peaches, $7.50 per ton on #2 cling peaches, $12.50 per ton on #1 Lovells and 10.00 per ton on #1 grade of other Freestones, further payments to go forward at such time· as the money becomes available, and our directors may deem advisable.

"Complete settlement to the members cannot be made until such time as all peaches placed with canners on a co-operative basis have been sold, and final settlement has been made by them to the Association.

"Yours very truly,
"CALIFORNIA CANNING PEACH GROWERS.
"A. D. POGGETTO,
"Manager."

On the thirtieth day of July, 1923, the defendant Downey wrote to the plaintiff as follows:

"Sacramento, July 30, 1923.
"California Canning Peach Growers,
244 California Street,
San Francisco, California.

"Gentlemen: This will advise you that I have made arrangements to ship the peaches upon the Manlove Ranch to the eastern market.

"Under your letter of July 16th, I was informed by you that the Manlove peaches had been sold to the Smith Frank Packing Company. Thereafter I secured the consent of the Smith Frank Packing Company to the release of my peaches from their contract, and relying upon your letter, and their release, my commitment has been made to an eastern shipment.

"I presume in any event I would have a right to make such shipment, and that you would not object to it, but certainly under the facts before enumerated I have the right to make the sale to which I have now committed myself.

"Very Truly Yours,
"SHERIDAN DOWNEY."

To this letter the canning company replied by letter of the same date, to wit:

"224 California Street,
"San Francisco, California.
"July 31st, 1923.

"Mr. Sheridan Downey,
314 Capital National Bank Bldg.,
Sacramento, California.

"Dear Mr. Downey: Your letter of July 30th, to us is at hand this day. We are not willing to release your peaches from your contract to us. Smith Frank Packing Company is operating for us on a co-operative basis and in order to make our operations through that company successful it is necessary that they shall have all the peaches which we have assigned to them. We regret, of course, that without consulting us you have made some sort of a committal for eastern shipment, but we cannot allow that fact to jeopardize our interests in having the Smith Frank Packing Company make a successful run this season.

"If growers desire to obtain a release for green fruit shipments they should make application to the Association before the Association has completed its arrangements for the disposition of the fruit.

"Regretting our inability to comply with your request, we are,
"Yours very truly,
"CALIFORNIA CANNING PEACH GROWERS.
"C. D. POGGETTO, Manager."

It may be further stated that the defendant Downey testified that he acted under the belief that his peaches had been sold to the Smith-Frank Packing Company. The testimony which we have set forth shows, however, that no sale had been made and that an assignment only had been made to the Smith-Frank Packing Company to cover the peaches grown by the defendant upon a co-operative basis. The theory upon which the respondent rests his case appears to be: 1st. That the conversation had with Mr. Temple Smith of the Smith-Frank Packing Company amounted to a release of the respondent's peaches and released him from the terms of his contract in so far as the handling of the peaches was concerned by the plaintiff corporation; and, 2d. That the letter dated July 16, 1923, constitutes an estoppel against the plaintiff to set up the fact that the peaches had only been allotted and not sold to the Smith-Frank Packing Company. Upon the part of the appellant it is insisted that the letter does not amount to an estoppel, that the conversation had with the Smith-Frank Packing Company, taking the defendant's version alone, does not amount to a release or, if it did, the Smith-Frank Packing Company had no authority to make any release and could not give to the defendant any release which would absolve the defendant from his contractual relations with the plaintiff. While in some portions of the briefs the argument is presented on the theory that the defendant's peaches were resold to him by Smith-Frank Packing Company, the answer sets up only the claim of a release and the testimony, which, when analyzed, shows that there was no element of sale entering into the negotiations between Smith-Frank Packing Company and the defendant Downey, irrespective of whether the defendant's version is accepted or that given by the witness Temple Smith.

Preceding the execution of the marketing agreement the transcript shows that the defendant Downey had made application for admission to membership in the plaintiff California Canning Peach Growers, a corporation, and had been received as a member therein. The marketing agreement necessary to be considered in this case contains, among others, the following paragraphs:

5. "The buyer shall pool the peaches of the grower with peaches of like kind, grade and classification purchased by

the buyer under contracts similar to this, and the price to be paid to grower therefor shall be based on the average price per pound at which all peaches of like kind, grade and classification shall have been sold by the buyer. If, however, the grower request the buyer to sell the peaches purchased of the grower to any given purchaser, the buyer, if such sale can be made, will comply, if the prices and terms of sale are at least equal to the minimum fixed by the buyer at such time, and if such sale will not in any way injuriously affect the business of the buyer. Such sale shall not, however, affect or change the basis or manner of accounting to grower.''

8. ''Each year the buyer will sell the peaches purchased by it in that year at the best obtainable market price, and pay the proceeds to the growers named in this and similar contracts, first deducting any advances made the grower, and each grower's *pro rata* share of the cost of receiving, handling, storing, advertising, and marketing, and other Association expenses, including depreciation and an Association charge not to exceed 5% of the gross sales. From this 5% organization and other general Association expenses, shall be deducted, and with the balance a commercial reserve shall be created. The annual surplus from such Association charge must be pro-rated among the growers in that year on the basis of the crop purchased from each.''

12. ''Grower, upon written consent of the buyer, may retain and sell all or part of his peaches green or dry, for use green or dry, but only to or through persons, firms or corporations which then have written contracts with the buyer, providing that the said purchasers shall handle said peaches for green use or dry use only. Grower agrees to give buyer immediate written notice of such sale, and will render an accounting to buyer for the peaches so sold by him; provided that no such sales shall be made after June first of any year, or such later date as the buyer may designate.''

19. ''Buyer may make regulations from time to time for release of peaches for sale by grower for strictly home canning or home use.''

Paragraph 13 of the marketing agreement, after setting forth that it would be impracticable and extremely difficult to fix actual damages, sets forth that fifty per cent of the

marketing price of peaches at the time of any member's breach of the agreement entered into by him shall be considered and is by that paragraph fixed as liquidated damages and also such sum as the trial court may allow for attorney's fees in any action brought against a member for violation of his contract.

[1] The several provisions of the marketing agreement, as hereinbefore set forth, show clearly that the whole intent and purpose of the co-operative plan are that all of its members shall stand upon an equal basis, bearing an equal proportion of the expenses of maintaining the corporation, marketing the crops, and then share upon the same basis in the proceeds available for distribution, based upon the several grades of fruit raised by the different growers. All the peaches of like kind are to be pooled and all growers having peaches of a like kind receive exactly the same price for their product, irrespective of the fact that different quantities of the same grade of fruit may be sold for different prices. In other words, the essential foundation of the co-operative association is equality of burden and equality of profits, irrespective of whether one particular grower's crop may or may not be sold upon the most favorable market. Thus we find in paragraph 5 that the grower is to receive for his peaches the average price per pound at which all peaches of a like kind, grade, or classification may have been sold. To accomplish these purposes it is necessary that the buyer named in the agreement, which is the plaintiff in this case, have practically absolute control of the disposition and marketing of the fruit raised by different members. Were this not true the different members would be placed in direct competition with each other. Subdivision 8 sets forth the expenses and such items as shall be charged against the crop of each member grower.

[2] Paragraph 12 of the agreement, which is discussed at considerable length in the briefs of counsel, specifies the only procedure or method by which a grower may be permitted to retain and sell his own crop. Even in such case sales can only be made through persons, firms, or corporations which have written contracts with the buyer, i. e., with the plaintiff in this case, and it is further agreed that such sales shall be only for green use or drying purposes,

i. e., such peaches shall not be sold so as to come in competition with the peaches raised by other member growers suitable for canning purposes. Paragraph 19 of the agreement allows the canning company, the plaintiff in this case, to release peaches for sale for strictly home canning or home use. There is no claim in this case that the California Canning Peach Growers, the plaintiff and buyer named in the agreement, has executed any release or authorized the respondent to make any disposition of his fruit other than to deliver his crop of peaches to the Smith-Frank Packing Company at Manlove. The place of delivery is an important factor in the handling of fruit to the intent that excessive quantities of fruit may not be directed to be delivered at any place and an insufficient quantity at other points. The most favorable construction that can be given to the conversation had with the Smith-Frank Packing Company by the respondent is, at best, only conditional, that is, if the Smith-Frank Packing Company had bought the peaches and had the authority to make a release which would bind the plaintiff in this case, they were willing to release. It is evident, however, from a reading of the terms of the contract and from what we have said that no authority to execute any such release was vested in the Smith-Frank Packing Company. The respondent, as a member of the peach canning company and as a party executing the agreement to which we have referred, certainly had knowledge of the provisions of the agreement, and that the Smith-Frank Packing Company had no power or authority to change any of its provisions. The very paragraph, to wit, No. 12, which refers to the sale of certain kinds of peaches by the grower, by its language, limits sales by the grower to such as are made prior to the first day of June of any year. The evident purpose of this again is to prevent competition by a grower in selling his peaches in the same market where the canning company is endeavoring to make sale of its fruit. For the more effectual purpose of carrying out the objects of the co-operative company, the title to all the fruit is vested in the canning company and consent to any other method of distribution than that set forth must be had from the canning company. [3] Even in such cases the paragraph of the agreement to which we have referred requires a full accounting of the proceeds

of sales made by growers of released crops or released portion of their fruit, so that the members of the association may be placed upon an equal footing and not disadvantaged by reason of such released sales. In other words, if the canning company should make sale of fruit at thirty dollars per ton and a released member grower should by advantageous circumstances secure forty dollars per ton, such grower would have to account to the canning company for the sale of his peaches at the advanced price and would be entitled to receive as his proportion, after the accounting, the average price received by the other members of the association for the sale of a like quality and quantity of their fruit. This appears to be the very thing which the respondent avoided or sought to avoid in the disposition of his peaches through the Earl Fruit Company. The respondent's offer to pay five per cent does not meet the requirements of his contract. Under the agreement, had an official release been executed by the plaintiff, or even through the medium of the Smith-Frank Packing Company, an accounting would have been had from the respondent to the plaintiff, and the respondent then only entitled to the average price for his peaches, as received by other member growers for a like quality of fruit. If the agreement could be construed otherwise, it would nullify the whole scheme of co-operation, because competitors, wishing to break down co-operative enterprises, would adopt the very tactics in obtaining fruit which the agreement prohibits and so break up co-operative associations and leave the field thereafter free for their own exploitation. As said by the court in *Anaheim C. F. Assn.* v. *Yeoman,* 51 Cal. App. 759 [197 Pac. 959]: "The existence and life of the association itself depended upon its being furnished fruit to dispose of in the public market. A reduction in the amount of fruit so handled would not only tend to increase the overhead cost to the nontransgressing members, but we may assume, to some extent affect the prestige and standing of the association as a marketing concern." The Anaheim case considers fully the legality of such co-operative associations' purposes, etc., and, as a hearing of that case in the supreme court was denied, it may be taken as settling the different phases of the law there considered relative to co-operative organizations.

There is no claim that the Earl Fruit Company was a firm, corporation, or otherwise, having an agreement with the plaintiff for the handling of fruit, or any person or corporation through or by which any member grower was authorized to contract for the handling of his crops. [4] From what we have said and the paragraphs of the agreement which we have set forth, it is also apparent that the officers of the canning company could not release the peaches grown by the respondent so as to exonerate the respondent from accounting to the canning company for the proceeds of his peaches without violating the terms of the agreement with other grower members of the association. All the other members of the association have an interest in the proceeds received from the sale of the respondent's peaches, they are entitled to share therein and to have the prices for their own peaches enhanced to the extent of any sum which the respondent may have secured by reason of a sale made outside of the dealings of the association. This pecuniary interest the officers of the association cannot waive or release, as that is one of the fundamental rights belonging to every member of the association. Every member of the association must, of course, be held to have knowledge of all of these elements which enter into co-operative marketing agreements. They are not simply agreements entered into with an agent, although a few people may be selected to act in the capacity of officers to manage the business of the association. The agreements are essentially to and with all the other members of the co-operative association and the interests of every member rest upon the same foundation, and no member can be advantaged to the detriment of any other member. Of all this each member must also be held to have full knowledge, as the contract sets forth all of these facts in equalizing burdens and advantages.

[5] The respondent's theory is that the plaintiff is estopped by reason of its letter dated July 16, 1923, written by the secretary of the association. The respondent also relies upon the alleged release of his peaches by the Smith-Frank Packing Company, but it is apparent from what we have said that the respondent had no right to rely upon anything that the Smith-Frank Packing Company said as to its willingness to release the respondent, because it had no

authority whatever to execute a release of the agreement and rights held by the California Canning Peach Growers, and of this fact the respondent, as a member of the marketing agreement, must have had full knowledge. If the respondent acted upon that conversation as constituting a release, he must have done so with the full knowledge that his contract provided otherwise and that a release could only be obtained from the canning company, as conditioned in the agreement requiring full accounting. There was no lack of knowledge of these matters on the part of the respondent and the conversation had with Smith-Frank Packing Company indicated clearly that the Smith-Frank Packing Company did not consider itself in a position to grant any release, but simply a willingness to do so and that it would, in effect, make no difference to them.

Again, the letter of July 16th written by the secretary of the corporation does not evidence anything indicating an expectancy or promise that the respondent deliver his peaches other than as therein indicated, and does not authorize any other conduct on the part of the respondent. In *Murphy* v. *Clayton*, 113 Cal. 153 [45 Pac. 267], the court, in considering some of the requirements necessary to constitute estoppel, says: "In *Lux* v. *Haggin*, 69 Cal. 266 [10 Pac. 674, 676], the court said: 'To constitute the estoppel the party claiming the benefit of it must be destitute of knowledge of his own legal rights, and of the means of acquiring such knowledge. (*Biddle Boggs* v. *Merced etc. Co.*, 14 Cal. 279; *Stockman* v. *Riverside etc. Co.*, 64 Cal. 57 [28 Pac. 116]; *Morrill* v. *St. Anthony Falls*, 26 Minn. 222 [37 Am. Rep. 399, 2 N. W. 842].) To constitute such an estoppel it must also be shown that the person sought to be estopped has made an admission or done an act, with the intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, inconsistent with the evidence he proposes to give, or the title he proposes to set up; that the other party has acted upon or been influenced by such act or declaration; that the party so influenced will be prejudiced by allowing the truth of the admission to be disproved. (*Brown* v. *Bowen*, 30 N. Y. 519 [86 Am. Dec. 406]; *Plumb* v. *Cattaraugus County Mut. Ins. Co.*, 18 N. Y. 392 [72 Am. Dec. 526].)' "

Also, upon this phase of estoppel, the principles applicable are set forth in 21 C. J. 1126: "It is an essential element of equitable estoppel that the person invoking it has been influenced by and has relied on the representation or conduct of the person sought to be estopped; and this rule applies with equal force and effect as well where the conduct of the party sought to be estopped consists of silence as where it consists of positive acts. There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be the immediate or proximate result of the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely upon them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise. As a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct or representations of the party sought to be estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in controversy, but should have also been without convenient or ready means of acquiring such knowledge. One relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require."

[6] As a further defense the respondent alleges a novation. Here, again, we find no tenable ground as a defense. Sections 1531 and 1532 of the Civil Code provide the rules for determining the question of novation in this state. The first section referred to lays down three methods: "1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; 2. By the substitution of a new debtor in place of the old one, with intent to release the latter; or 3. By the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former." Here, again, essential elements

are wanting. None of the rights of the plaintiff is purported to be transferred and the Smith-Frank Packing Company expressly stated that it doubted its authority to exercise any such rights. Section 1532, *supra*, says: "Novation is made by contract, and is subject to all the rules concerning contracts in general." This is amplified in the case of *Young* v. *Benton*, 21 Cal. App. 382 [131 Pac. 1051], where the court said: "Novation, strictly speaking, implies four essential requisites: 1. A previous valid obligation; 2. The agreement of all the parties to the new contract; 3. The extinguishment of the old contract; and 4. The validity of the new one." There is nothing here which shows the agreement of all the parties to the new contract, nothing by which the parties to the old contract have contracted for its extinguishment. The act of one party alone cannot accomplish the result. As we have shown, the conversation between the respondent and Temple Smith of the Smith-Frank Packing Company did not establish any new contract, it was no sale of peaches from the packing company to the respondent and was only the expression of a willingness on the part of the packing company to release the peaches to the respondent, provided they had any authority so to do. There is only one of the four requirements which we find in this case, i. e., a previous valid obligation, which provided for the handling of the crop in the manner set forth in the marketing agreement. To the same effect, though not set forth so fully, is the opinion of the court in *California Packing Corp.* v. *Emirzian*, 45 Cal. App. 236 [187 Pac. 77].

It follows from what has been said that the judgment of the trial court must be reversed, and it is so ordered.

Hart, J., and Finch, P. J., concurred.