[Civ. No. 4385. Second Appellate District, Division Two.—March 28, 1924.]

## W. MORTON, Respondent, v. ALBERS BROTHERS MILLING CO. (a Corporation), Appellant.

[1] CONTRACTS—TIME OF DELIVERY—VOID ORAL EXTENSION.—Where a written contract for the purchase of milo maize contains a specific provision as to time of delivery, an unexecuted oral agreement extending the time of performance is void under section 1698 of the Civil Code.

[2] ID.—AGENCY — AUTHORITY TO MODIFY CONTRACT — EVIDENCE. — In this action for damages for alleged breach of a written contract to purchase milo maize, in which plaintiff relied upon an oral extension of the time of delivery, there was no evidence that the assistant manager of one of defendant's branch offices, with whom plaintiff made such oral agreement extending the time of delivery, had any authority to waive any provision of the written contract executed by his principal.

[3] ID.—WAIVER OF PROVISIONS—AUTHORITY OF AGENT.—Authority in an agent to carry out or to perform a contract already made by his principal does not include authority to change the contract or to waive any of its provisions, especially where the provision is one which was intended for the benefit of the principal.

(1) 13 C. J., p. 594, sec. 610. (2) 2 C. J., p. 645, sec. 289. (3) 2 C. J., p. 645, sec. 289.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Hickcox, Crenshaw & Trude for Appellant.

C. L. Brown for Respondent.

FINLAYSON, P. J.—This is an action for damages for the alleged breach of a contract to purchase milo maize. The jury returned a verdict for plaintiff, and from the judgment entered thereon the defendant appeals.

1. Admissibility of parol evidence to add to or vary a writing, note, 56 Am. St. Rep. 659.

See 6 Cal. Jur. 351, 375; 10 Cal. Jur. 916; 6 R. C. L. 914; 10 R. C. L. 1021.

3. See 6 Cal. Jur. 374; 21 R. C. L. 874.

Some of the milo was delivered and payment therefor was made by defendant. It is claimed by plaintiff that he was ready and willing to deliver the balance within the time provided for by an oral extension of the time for delivery, but that defendant wrongfully refused to accept it. Thereafter plaintiff sold the undelivered milo in the open market for $29 per ton. This action was brought to recover the difference between that and the contract price.

The facts of the case, as revealed by the pleadings and proof, are substantially these: On September 16, 1920, at Brawley, in this state, plaintiff and defendant executed a written contract which, so far as it is material to the questions presented, reads: "W. Morton has this day sold, and the Albers Bros. Milling Co., a corporation, of El Centro, California, has this day bought 250 tons of good No. 1. marketable milo now being grown or located Mead and Arnold Ranches, to be sacked in Standard, new jute bags at the purchase price of $50.00 per ton, said milo to be delivered F. O. B. cars main line points by Dec. 1st, and seller further agrees to keep said milo insured to the time of its delivery, in said Albers Bros. Milling Co.'s favor to an amount equal to that paid on same by said Albers Bros. Milling Co. The seller hereby acknowledges receipt of $1.00 on account of purchase price of said milo. Said Albers Bros. Milling Co. agrees to pay the balance on said purchase price of said . . . upon its delivery; should the delivery not be made within the time specified herein, it shall be optional with said Albers Bros. Milling Co., when delivery is made, to take said milo at the price stated herein, or at the market price at the time of said delivery."

It is claimed by plaintiff that on November 25, 1920, and while he had 250 tons of milo on deposit in warehouses at Calipatria and Rockwood ready for delivery, he and a Mr. Louis Prenot, the assistant manager of defendant's Los Angeles branch who then was visiting in the Imperial Valley, entered into an oral agreement whereby the time for delivery was extended to December 25, 1920. The testimony given by plaintiff in support of this claim, reduced to narrative form, is substantially as follows: About November 25, 1920, I went to the office of B. F. McCormick (a buyer for the defendant) and there found Mr. Prenot, who held up his hands and said: "Morton, we cannot take your corn." I

said, ''Why?'' and he said, ''We haven't the money to pay
for the corn and can't get it.'' I said, ''It puts me in bad
shape. I bought a ranch in Nevada and I expected this
money to help me make the payments on it and it is going
to put me in bad. I have to make a payment the first of
the year.'' He said, ''If we can get some time on the corn
we can take it. If you will give us until the first of the
year we will take the corn.'' I said, ''I can't do that, I
have to have my money on the first, but I will extend the
time to the 25th of December.'' He said, ''Morton, you are
a prince. If everybody understood this situation and looked
at conditions like you do we would all get by.'' I said,
''Mr. Prenot, I think we ought to have a little contract to
that effect,'' and he said, ''Very well.'' He turned around
and dictated a contract to Harry Cuthbertson (defendant's
local manager in the Imperial Valley), who wrote in pencil
on a piece of paper that they were to have an extension to
the 25th of December. This writing was never signed by
either party. Mr. Prenot instructed Cuthbertson to get a
typist to type this contract so we could sign it. Cuthbertson
went out and came back, saying he could not find a stenog-
rapher, that he had gone to lunch. Mr. Prenot then said,
''Well, let it go and to-night we will fix it up and leave it
here with Frank [B. F. McCormick] in the morning.'' I
said, ''All right, that is fair enough.'' I never got the
written contract for the extension. The following day I
met Mr. Prenot and I asked him about it. He said they
were too busy the night before and overlooked it, but ''We
will fix it up. I represent a seven million dollar concern
and we cannot afford to go back on our contract.'' I said,
''All right,'' and let it go at that. They were to pay me
for the corn as it was shipped, and they were to have until
the 25th of December in which to clean up the lot, the whole
works. There was no change in the contract as to the class
of corn they were to receive. On November 30th, at Braw-
ley, defendant caused tests to be made of the milo which I
had stored in the Calipatria warehouse. The tests showed
that there was one lot which had a moisture content of less
than 14 per cent and another which showed a moisture con-
tent of 14.7 per cent. After the tests were made Mr. Prenot
stated that he would take the lot which was within the mois-
ture test (the lot which showed a moisture content of less

than 14 per cent) as soon as they could get cars, and pay me for it, but that they would turn down the rest. Prenot told me he would not take any except the No. 1 marketable milo, as shown by the tests. Two or three days later (i. e., about December 2d or 3d) I came to El Centro to see Mr. Prenot. I asked him what he meant by having made this (oral) agreement with me and then turning it down. He said his hands were tied—he was working for a corporation and he could not do otherwise. They (meaning, doubtless, defendant's board of directors or managing officers) would not stand for it. I said, "Why didn't you tell me you could not do it?" He said he thought he could get it by. I said, "Mr. Prenot, I am going to bring suit to make you people pay me the difference on that corn. I hate a lawsuit, and hate trouble, but I am not going to take that loss." He said, "I will take it up with the company and see if we cannot yet fix this matter up. We don't want trouble." I said, "All right," and I didn't say anything more after that.

The written contract, it will be recalled, provides for the delivery of "good No. 1 marketable milo." A licensed government grain inspector, called as a witness for the defendant, testified that "good No. 1 marketable milo should have a moisture content of 14 per cent and under," and that "any milo which contains over 14 per cent moisture is not No. 1 milo." In fairness to plaintiff, who is a farmer and grower of corn, it should be added that he testified that he did not know that corn "should have a certain percentage of moisture"; that he "didn't know anything about it before," and that it "was new to us corn growers." This notwithstanding, the fact remains that the testimony of the licensed government grain inspector was not contradicted. Though plaintiff testified it was "new to us corn growers," he did not pretend to say that milo could be "good No. 1 marketable milo" and yet show a moisture content in excess of 14 per cent.

On or about the 8th or 10th of December, 1920, plaintiff, claiming that he had until December 25th under the oral extension of time within which to complete delivery, caused tests to be made of the milo. It was the same milo which was in the warehouse when defendant caused the tests of November 30th to be made. The milo must have "dried

out'' in the interim, for the tests which plaintiff caused to be made on or about December 8th or 10th showed a moisture content at that time of less than 14 per cent.

Plaintiff's case was tried by him upon the theory that his oral agreement of November 25th with Mr. Prenot was a valid agreement for the extension of the time for delivery, and that it was binding upon defendant. It also was plaintiff's contention in the trial court, as it is here, that because of his arrangement with Mr. Prenot it was permissible for him to cause tests of the undelivered milo to be made at any time between December 1st, the date fixed by the written contract as the limit of the time for delivery, and December 25th, the time fixed by the oral agreement; and that if such tests were made, and if, when made, they showed a moisture content of less than 14 per cent, then defendant would be legally obligated to accept the milo and to pay for it, notwithstanding the tests and the tender of the milo were made subsequent to the time fixed for delivery by the written contract. Indeed, it seems to be conceded, tacitly at least, that plaintiff's right to a recovery, if any he have, is wholly dependant upon the oral agreement between him and Prenot for an extension of the time for delivery.

Running all through appellant's brief, although most obscurely expressed, if indeed it be expressed at all, is the notion that the agreement for the extension of time is invalid. That this undeveloped idea lurks in the background of appellant's several contentions is shown by the following: During the trial plaintiff, testifying as a witness on his own behalf, was asked by his counsel if he had caused a test of the milo to be made as early as December 8th and not later than December 10, 1920. To this question defendant's counsel objected as follows: ''Objected to as incompetent, irrelevant and immaterial, for this reason: The contract, as stated here (the written contract of September 16, 1920) is a contract for delivery of corn on a certain date, and the contract has been introduced in evidence. The condition of the corn at the date of delivery [sic] is not material, because the character of the corn, or of any commodity, may change. It may be better or it may be worse, as the case may be. Under this contract they had a right to have a certain character or class of corn, to-wit: No. 1 marketable maize, delivered to them on or about a certain date. They

(defendant's agents) accepted delivery at the warehouse of that which was known as the Cramer lot on November 30th. They rejected the other. Now, they (plaintiff) cannot come in here and introduce evidence showing the condition of the corn under the contract at a later day, because it may have been better or it may have been worse, and it is immaterial which it was.'' The objection was overruled and the witness was permitted to testify that he did cause a test to be made between the 8th and 10th of December. The witness testified that the test made on that date showed a moisture content under 14 per cent. By another question propounded to plaintiff on his direct examination he was asked if, subsequent to the oral agreement, he held the corn for defendant under that agreement until the 25th of December. This question was objected to upon the ground, among others, that it was incompetent, irrelevant, and immaterial. The objection was overruled and the witness was permitted to answer the question in the affirmative. Assigning as error the rulings of the court on the objections to the questions last mentioned, appellant's brief presents the point as follows: ''The position taken by the defendant and appellant in this case, which we believe to be correct (is that) any test of the milo made after it was to be delivered under the contract (the written contract of September 16, 1920) was ineffectual and of no avail, as the price was rapidly falling and the defendants were only required to take so much of the milo as measured up to the standard stated in the contract. The foregoing questions and answers were a successful attempt by the plaintiff, over the repeated objections of the defendant, to get before the jury that the milo, some ten days after the date of delivery, would test according to contract. This was error, as the evidence in this case shows that milo under certain conditions would dry out rapidly, and especially the test they got before the jury made on the 9th or 10th of December, if it was the same milo, which was not proven, was made under conditions that would not be the same as the milo left in the sacks in the warehouse and therefore was not competent or material.'' Referring to another similar objection, appellant, in its opening brief in this court, says: ''The defendant had refused to take the milo on November 30th or December 1st, and if the plaintiff was right it was his duty then to sell

it, not to hold it in the warehouse while the price of milo was rapidly going down, and have tests made of it from time to time, and finally sell it when it became marketable.''

We have been at pains to state appellant's contentions thus fully in order that it may clearly appear that though appellant's counsel have not attacked the validity of the oral agreement upon any specific legal ground, its validity is nevertheless necessarily involved in the points presented to us for our determination. We shall proceed, therefore, to consider whether the oral extension of time for delivery was binding upon defendant, for that seems to be the decisive question in the case and one which is inescapable if all the implications of appellant's several points are to be passed upon and determined.

With respect to the validity of the oral agreement, respondent is confronted with two, and only two, alternatives: Either he must take the position that the arrangement which he testified he made with Prenot was an unexecuted oral agreement altering a written contract by extending the time for performance, or he must contend that it was a parol waiver of a provision inserted in the written contract for the benefit of the buyer. **[1]** If the first alternative be adopted then it must be held that the oral agreement is void under section 1698 of the Civil Code. (*Henehan* v. *Hart,* 127 Cal. 656 [60 Pac. 426] ; *Harloe* v. *Lambie,* 132 Cal. 133 [64 Pac. 88] ; *Standard Box Co.* v. *Mutual Biscuit Co.,* 10 Cal. App. 746, 755 (103 Pac. 938].) **[2]** If the second alternative be espoused, then, while there seems to be authority for the proposition that section 1698 does not prevent a valid oral waiver of a written provision inserted for the benefit of the party waiving it (*Fairbanks, Morse & Co.* v. *Nelson,* 217 Fed. 218 [133 C. C. A. 212]), there is no evidence that Prenot had authority to waive any provision of the written contract. Indeed, Prenot himself, according to respondent's testimony, personally notified the latter on or about December 2, 1920, that he had no authority to grant the extension. This Prenot did, in effect, when, in reply to respondent's inquiry as to what he meant by making the new agreement and then ''turning it down,'' he said that ''his hands were tied,'' that ''he was working for a corporation'' and that ''they [presumably the officers of the corporation] would not stand for it.''

[3]   Prenot was not a general officer. He was only an assistant manager for appellant at one of its branch offices. It possibly may be inferred from the evidence that he was authorized to do certain things which were necessarily incident to the performance of the written contract, such, for example, as seeing to it that proper tests were made to determine whether the milo measured up to the requirements of the contract. But authority in an agent to carry out or to perform a contract already made by his principal does not include authority to change the contract or to waive any of its provisions, especially where, as here, the provision is one which was intended for the benefit of the principal. Presumptively, an agent is employed to acquire interests, not to give them up. (*Gerrish* v. *Maher*, 70 Ill. 470; *Hutchings* v. *Munger*, 41 N. Y. 155; *Thomas* v. *Anthony*, 30 Cal. App. 217 [157 Pac. 823]. See, also, 2 C. J., pp. 645, 646.)

The judgment is reversed.

Works, J., and Craig, J., concurred.