[Civ. No. 3442. Third Appellate District.—May 8, 1928.]

CALIFORNIA CANNING PEACH GROWERS, Appellant, v. JOHN HARRIS, Respondent.

Hadsell, Sweet & Ingalls and Farnsworth, Burke & Maddox for Appellant.

Power & McFadzean and J. Thos. Crowe for Respondent.

BUCK (G. F.), J., *pro tem.*—Plaintiff is a nonprofit cooperative marketing association, organized in 1921 under the laws of the state of California. From the beginning the defendant John Harris was a member of the association and, with his fellow-members, had signed a marketing agreement with the association whereby he sold to the association, to be marketed for the benefit of himself, all of the peaches to be grown by him on a twenty-acre orchard for the next fourteen years.

During the years 1922 and 1923 defendant's yearly crop was delivered and marketed under the terms of the marketing agreement. But during the season of 1924 the defendant sold his crop to other parties and failed to deliver any part of it to the association. Upon suit being brought by the association to recover the punitory damages provided for in the agreement, the defendant John Harris set up as a defense his claim that there was an anticipatory breach of the marketing agreement on the part of the association. Upon the trial of the case before the court, sitting without a jury, the court found in accordance with the defendant's claim of an anticipatory breach that "during the summer of 1924, about the month of June, and shortly before any of the peaches mentioned in the marketing agreement were ripe and ready for delivery, the plaintiff association informed the defendant John Harris that it would not accept or receive said peaches or any part thereof; and that said plaintiff did

then and there fail and refuse, and ever since has failed and refused to accept said peaches, or any part thereof.''

The court, accordingly, after having granted a nonsuit as to the defendant Lizzie Harris, gave judgment in favor of the defendant John Harris, and against the plaintiff. From this judgment in favor of the defendant John Harris the plaintiff appeals, and bases its appeal upon the ground that the evidence is insufficient to sustain the foregoing finding of an anticipatory breach on the part of the plaintiff such as would justify the defendant in failing to deliver his peaches to the association under the terms of the written agreement.

The rule, of course, is well established that a party to an executory bilateral contract may avail himself of a refusal of performance made by the other party in advance of the time of performance either as a basis for an action for damages or may himself set up such refusal as a defense to his own performance. (Civ. Code, secs. 1440, 1511, par. 3, 1515, and 6 Cal. Jur., pp. 457 to 460; *Alderson* v. *Houston,* 154 Cal. 1, 12 [96 Pac. 884]; *Howard* v. *Galbraith,* 13 Cal. App. 373, 377 [109 Pac. 889]; 13 Cor. Jur. 653, 654.)

As regards the nature and character of the refusal by one party which will justify nonperformance by the other, the rule is well stated in the case of *Rauer* v. *Harrel,* 32 Cal. App. 45, at p. 66 [162 Pac. 125, 133], as follows: ''Before the salt company could avoid performance, defendant's refusal to perform should appear to have been explicit, positive, and unequivocal. The rule stated by Mr. Benjamin is as follows: 'A mere assertion that the party will be unable, or will refuse to perform his contract is not sufficient; it must be a distinct and unequivocal, absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made.' (Benjamin on Sales, sec. 568.)

''In 6 Ruling Case Law, page 1025, the rule is thus stated: 'In order to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal and absolute. . . . It may be observed, however, that the renuncia-

tion itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party.' (*Hanson* v. *Slaven*, 98 Cal. 377, 382 [33 Pac. 266]; *Bell* v. *Bank of California*, 153 Cal. 234, 242 [94 Pac. 889].)

"In *Smoot's case*, 15 Wall. 36 [21 L. Ed. 107], it was held that mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient to terminate it; it must be a distinct and unequivocal absolute refusal to perform, treated and acted on as such by the promisee. Approved in *Dingley* v. *Oler*, 117 U. S. 503 [29 L. Ed. 984, 6 Sup. Ct. Rep. 850]."

For the purpose of showing an abandonment by the association of its contract by its claimed refusal in June of 1924, to accept future delivery of defendant's peach crop, defendant testified that Ross Danison, one of the directors of the association, came to his place in June, 1924, and stated to him: "We cannot accept Elberta peaches." Witness continuing: "I didn't say anything to that. There wasn't particularly so much conversation, only that they cannot receive those Elberta peaches. He said, the first time when he came over in June, that they cannot accept those Elberta peaches. After that my wife took charge of these peaches and says, 'Since they refused I am going to sell them myself'; and I didn't have anything to do with it any more. She sold them to the Kings County Packing Company or cannery." Also, F. W. Brown, the district representative of the plaintiff, testified that he informed defendant of the contents of the marketing agreement and what would be the result if defendant broke his contract and asked defendant to go and see the only lawyer that witness knew of in Reedley and to talk to his neighbors before he violated the contract, and that defendant then "said that he could get more money for his freestones and that we would not accept his freestones." The Elberta peaches, it seems, were freestones and the balance of his crop consisted of clingstone peaches.

Ross Denison, when called as a witness by the defendant, testified that he, Ross Denison, had an agreement with Mr. Pogooto, the manager of the plaintiff, to receive crops of peaches in the vicinity of Reedley. During the year 1923

the plaintiff engaged in co-operative canning. Before that time all members' peaches were sold to commercial canneries; Denison was asked to look after receiving for the Herbert Packing Company which was canning co-operatively for the association, part of the crop being sold to other canneries in Reedley in a raw state. The witness testified that it was part of his duty to solicit growers to designate the Herbert Packing Company as the receiving point, and in his conversation of June, 1924: "I asked Mr. Harris to designate the Herbert plant as a receiver for his peaches . . . As I remember, I asked Mr. Harris for his cling peaches, stating that we could not handle the Elbertas. Now I can't remember the exact words, but that was the essence of it . . . I wasn't the only one receiving from the association. The association was delivering to different plants. But I was the only one that received for the Herbert Packing Company for the association. Q. The variety of peaches and the tonnage that would be received was left by the association to you, was it not? A. Certain agreements were made with the Herbert Packing Company to can a portion of the tonnage of fruit controlled by the California Canning Peach Growers. This plant was only engaged in canning cling peaches. Q. Did you tell Mr. Harris that you didn't see your way clear to take from him any freestones? A. Yes, I wanted to convey to Mr. Harris that it would not be very easy for us to handle them up there and I would only take the clings at the plant. Q. Did you tell Mr. Harris in that conversation that he would have to make some other disposition of those freestones? A. By 'disposition' you mean what? Q. Sell or get rid of them some way? A. Words to that effect yes. Cross-examination: Mr. Sweet: Q. You merely asked him if he wanted to deliver them to the Herbert Packing Company, his clings? A. I think that is the way I specified it. I can't exactly recall the words. Q. Mr. Pogooto didn't tell you to tell any one that the association would refuse to receive any peaches it had contracted for, did he? A. I didn't get any definite instructions from Mr. Pogooto. Q. You can answer the question 'yes' or 'no'? A. No. Q. The board of directors never told you to reject any peaches that the association had agreed to receive, did they? A. No, decidedly not. Q. You

never told Mr. Pogooto that you had refused or had told any grower that the association would not take any peaches that it contracted for, did you? Is that clear? A. Yes, that is clear. No; I didn't tell Mr. Pogooto that. Q. And you didn't tell the board of directors that, did you? A. I don't believe we had a board of directors meeting until after the peaches were being delivered.''

For the purposes of this appeal it may be assumed that the trial court, acting within its power to pass upon the credibilty of the witness and the weight of their testimony, did not entirely accept the testimony of the witness Denison to the effect that the refusal to accept the Elberta peaches was limited to a refusal only to accept them for delivery at the plant of the Herbert Packing Company, which was handling cling peaches alone. But that the court chose rather to accept the testimony of the defendant to the éffect that the defendant understood and was justified in understanding from his conversation with Denison that there was an unqualified refusal on the part of the association to accept, for any purpose or at all, defendant's Elberta peaches. But the vital question still remains as to what extent, if any, was Denison authorized to bind the association by the unqualified refusal testified to by the defendant.

It is the contention of learned counsel for defendant ''that the preponderance of all the evidence introduced at the trial shows conclusively that Denison was acting in the capacity of agent of the California Canning Peach Growers, and that the rejection of the respondent's Elberta peaches was within the scope of his authority.'' And in support of his contention cites and quotes from the following authorities: *Venice* v. *Short Line Beach Land Co.,* 180 Cal. 447 [181 Pac. 658]; *Newton* v. *Johnson Organ Mfg. Co.,* 180 Cal. 185 [180 Pac. 7]; 6 Cal. Jur. 1099; *Stevens* v. *Selma Fruit Co.,* 18 Cal. App. 242 [123 Pac. 212]; *Nicholson* v. *Randall Banking Co.,* 130 Cal. 533 [62 Pac. 930].

These authorities as quoted from by counsel lay down the well-established rules that the authority of an agent to act for a corporation may be shown by evidence that the person does business for the corporation and in its behalf as agent with the knowledge and acquiescence of its directors or general manager or by their directions. And

that where a corporation holds out to the world as its agents persons apparently clothed with power to transact ordinary business, third parties will not be permitted to suffer from the acts of such agents by the corporation's attempted defense that the ostensible authority was not in fact conferred, And that when a corporation, by a long course of acquiescence, holds out an officer or agent as having the authority to do certain things, it cannot, after he has acted, repudiate his acts. ■ But in the case at bar there is no evidence that Denison, with the knowledge and acquiescence of its directors or general manager or by their direction, ever had exercised authority of the kind called in question in this case. In fact, the testimony in the case is directly to the contrary. Furthermore, there is no evidence in the record indicating that the business in question claimed to have been transacted by Denison could be deemed to be incidental to or connected "with power to transact ordinary business." Furthermore, there is no evidence in the record showing any ratification on the part of the corporation of the claimed conduct of the assumed agent in refusing in advance to accept defendant's peaches.

The fact that Denison had, at a time prior to the organization of the corporation, solicited the subscription to membership of the defendant, or the fact that the said Denison was a director of the corporation, did not vest in him the power to release the defendant from his obligation to deliver his crop in accordance with the marketing agreement. The mere fact that the trial court may have found, according to the testimony of the defendant, that the defendant understood Denison to state, without qualification, that the association would not in any event or at any time receive his freestone peaches when they would be ripe and ready for delivery, is not and cannot be held to be the sole test of the authority of Denison in the matter. The test is not what the defendant believed when he availed himself of a better offer and allowed his wife to sell the peaches. But the test is what, under all the surrounding circumstances was he, by the acts and conduct of the plaintiff, justified, as a reasonable man, in believing.

As regards the nature and relative importance of the act of the assumed agent: Without going into any extensive dis-

cussion as to the purposes and necessary business methods of co-operative marketing associations, it may be stated that the whole legislative and business scheme of such an association necessarily depends upon the ability of the association to hold and control the subject matter of its operations. It is only by holding such control that it can give to its members the benefit of such a bulk and quantity handling and increased credit facilities as will, first, diminish the cost of preparing for market and marketing the product in question; and second, will enable the producers properly to control such a share of the commodity protected as will enable them to set such a stabilized price for the commodity as will at the same time be attractive to the consumer and will afford a living profit to the producer; all of which would be accomplished without detriment to anyone except speculators and intermediate handlers who may seek unduly to reap where they have not sown.

It would therefore seem that any act on the part of any assumed agent tending to defeat such an essential legislative purpose would be of such an extraordinary and vital character that it could not be exercised as a mere incident to the authority of a subagent but should be conferred, if conferred at all, directly by the express act or conduct of the governing body of the association.

The general principle that the mission of an agent is "to fulfill but not to destroy" is clearly stated, with appropriate citations, in the case of *Morton* v. *Albers Bros. Milling Co.,* 66 Cal. App. 391, at page 398 [226 Pac. 809, 812], where the court uses the following language: "Prenot was not a general officer. He was only an assistant manager for appellant at one of its branch offices. It possibly may be inferred from the evidence that he was authorized to do certain things which were necessarily incident to the performance of the written contract, such, for example, as seeing to it that proper tests were made to determine whether the milo measured up to the requirements of the contract. But authority in an agent to carry out or to perform a contract already made by his principal does not include authority to change the contract or to waive any of its provisions, especially where, as here, the provision is one which was intended for the benefit of the principal. Presumptively,

an agent is employed to acquire interests, not to give them up. (*Gerrish* v. *Maher*, 70 Ill. 470; *Hutchings* v. *Munger*, 41 N. Y. 155; *Thomas* v. *Anthony*, 30 Cal. App. 217 [157 Pac. 823]. See, also, 2 Cor. Jur., pp. 645, 646.)''

And not only was the provision herein ''one which was intended for the benefit of the principal'' but it was also one which was intended essentially for the benefit of each of the members of the association; and, even beyond that, was one involving the interests of the public. First, in regard to the association as stated in the case of *Anaheim C. F. Assn* v. *Yeoman*, 51 Cal. App. 759, at p. 763 [197 Pac. 959, 961] : ''The existence and life of the association itself depended upon its being furnished fruit to dispose of in the public market. A reduction in the amount of fruit so handled would not only tend to increase the overhead cost to the nontransgressing members, but, we may assume, to some extent affect the prestige and standing of the association as a marketing concern. The argument would be the same, regardless of the quantity of fruit which might have been delivered by the defendant, whether it composed but a small fractional part or one-half or more of the entire product designed to be marketed by the plaintiff agency.'' And second, in regard to the members of the association, including the defendant himself: As stated in the case of *California C. P. Growers* v. *Downey*, 76 Cal. App. 1, at page 15 [243 Pac. 679, 684] : ''All the other members of the association have an interest in the proceeds received from the sale of the respondent's peaches. . . . Every member of the association must, of course, be held to have knowledge of all of these elements which enter into co-operative marketing agreements. They are not simply agreements entered into with an agent, although a few people may be selected to act in the capacity of officers to manage the business of the association. The agreements are essentially to and with all the other members of the co-operative association and the interests of every member rest upon the same foundation, and no member can be advantaged to the detriment of any other member. Of all this, each member must also be held to have full knowledge, as the contract sets forth all of these facts in equalizing burdens and advantages.''

And finally, as regards the interests of the general public in the protection of these marketing agreements. In the very recent case of *Liberty Warehouse Co.* v. *Burley Tobacco etc. Assn.*, 276 U. S. 71 [72 L. Ed. 292, 48 Sup. Ct. Rep. 291], decided February 20, 1928, the supreme court of the United States, after a full review of all the authorities, went to the extent of holding that a marketing agreement of a co-operative marketing association of farmers is, by reason of the public interests it subserves, entitled to such extraordinary protection as to render valid and constitutional a state statute declaring any person guilty of a misdemeanor who shall "knowingly induce or attempt to induce any member or stockholder of an association organized hereunder to breach his marketing contract with the association, or to maliciously and knowingly spread false reports about finances or management thereof." In holding as above, the supreme court demonstrated its high capacity to so interpret legal principles and the safeguards of the constitution as to make our basic laws conform to present economic and social conditions, and be actually, and not merely theoretically promotive of the general welfare. For, in rendering its decision, the court said: "Undoubtedly the statute does prohibit and penalize action not theretofore restricted, and to that extent interferes with freedom. But this is done to protect certain contracts which the legislature deemed of great importance to the public and peculiarly subjected to invasion. . . . It is stated without contradiction that co-operative marketing statutes, substantially like the one in the review, have been enacted for forty-two states. . . . These statutes reveal widespread legislative approval of the plan for protecting scattered producers and advancing the public interest."

We are, therefore, of the opinion that the evidence in this case being insufficient to show agency on the part of Denison, is insufficent to sustain the finding of the trial court that the plaintiff refused to accept defendant's fruit, or that the plaintiff failed to keep or perform the terms, conditions and covenants of the marketing agreement.

The judgment, therefore, is reversed.

Hart, Acting P. J., and Plummer, J., concurred.