[Civ. No. 4493. Third Appellate District.—May 20, 1933.]

CALIFORNIA CANNING PEACH GROWERS (an Unincorporated Association), Appellant, v. BARDELL & OREGONI et al., Respondents.

154

Hadsell, Sweet & Ingalls for Appellant.

R. M. Dunne and Edward Van Vranken for Respondents.

PLUMMER, J.—As filed in the trial court the complaint in this action named the defendants as follows: "Bardell & Oregoni, V. Bardell, John Doe Oregoni, Richard Roe and Sam Stoe". While our attention has not been called to the substitution of the name of Maria Oregoni as one of the defendants given a fictitious name in the title, it appears from the record that she filed an answer as one of the defendants. The complaint does not allege the existence of any partnership between the defendants, but simply sets forth that the defendants, on a certain date, applied for membership in the plaintiff-association. Upon this appeal it is contended that U. Bardell, G. B. Oregoni and Maria Oregoni are copartners. The trial court, however, found that the partnership consisted only of U. Bardell and G. B. Oregoni. (We may here state that the names of the defendants are spelled differently in different portions of the transcript, but we will follow the spelling as given above.)

The plaintiff, appellant in this action, is an association regularly incorporated under the laws of the state of California, as a nonprofit co-operative association, for the purposes of marketing peaches grown by the members of the association. The general features of the association have been fully set forth by this court in the case of *California Canning Peach Growers* v. *Downey,* 76 Cal. App. 1 [243 Pac. 679], and *California Canning Peach Growers* v. *Harris,* 91 Cal. App. 654 [267 Pac. 572], and need not be again set forth herein.

The defendants are the owners as cotenants of a trifle over 179 acres of land situate in San Joaquin County, upon which they were engaged during all the times mentioned herein in raising peaches for the market. G. B. Oregoni and Maria Oregoni are, and were, during all of said time, husband and wife. On the eleventh day of June, 1928, Bardell & Oregoni and the plaintiff entered into a marketing agreement covering the marketing of peaches grown upon the lands of the defendants, beginning with the year 1928, and ending with the year 1936, both years inclusive. The agreement, so far as the defendants are concerned, was signed "Bardell & Oregoni, by U. Bardell". The agreement contains no recital of the members composing the partnership,. nor any recital that Bardell & Oregoni constitute a partnership. No mention is made of the ownership of the premises included in the agreement, or of the fact of any of the premises being owned by the respective parties as cotenants.

The agreement describes the plaintiff as the buyer and the defendants as the grower. While this form of the agreement is used, the association really directs the place where the grower shall make delivery of peaches, and also to whom delivery is to be made. Whether the association is the actual buyer of the peaches, or is simply the controlling agent for the marketing of the peaches, the collecting of the moneys agreed to be paid therefor does not need to be further considered, as this court has held such agreements valid irrespective of the legal relationship created by the execution of the standard form of marketing agreements.

. After setting forth what each of the contracting parties may do, provision is made for the termination thereof, paragraph 18 reading as follows: "The grower may file with the buyer, between February 1st and March 1st of each of the years 1924, 1926, 1928, 1930, 1932 and 1934, a written notice of his desire to withdraw from this contract, and the buyer will thereupon give its written release thereof, and thereupon said contract shall be canceled as to the succeeding years of the contract period. And the buyer is also hereby given the right to give notice to the growers, between March 1st and May 1st of either of the above named years, of its desire to withdraw from this

contract, and thereupon said contract shall be canceled as to the succeeding years of the contract period.''

On February 1, 1930, the defendants, U. Bardell and G. B. Oregoni, through their attorneys, gave the following notice to the plaintiff-association:

"Law Offices
"Gumpert & Mazzera
"Bank of Italy Building,
"Stockton, California.

"February 1, 1930.

"California Canning Peach Growers,
"244 California Street,
"San Francisco, California.

"Dear Sirs: The undersigned, G. B. Oregone and U. Bardell, Route 1, Box 449, hereby give notice of withdrawal from the California Canning Peach Growers Association as per previous communications with you.

"Very truly yours,
"U. BARDELL and G. B. OREGONE,
"Route 1, Box 449,
"By GUMPERT & MAZZERA,
"Attorneys.''

To this notice the plaintiff, under date of February, 1930, replied as follows:

"Bardell & Oregoni, No. 2429.
"R. F. D. 1, Box 449,
"Stockton, California.

"Gentlemen: We beg to acknowledge your letter under date of February 1, 1930, wherein you give orders of withdrawal from your membership contract with the Association. As your notice of withdrawal has been filed in accordance with the provisions of Paragraph No. 18 of the Marketing Agreement, we hereby cancel contract in compliance with your request. We regret very much that you have elected to withdraw your support from our Association, and thanking you for the cooperation and support you have given, we are,

"Very truly yours,
"CALIFORNIA CANNING PEACH GROWERS,
"By A. D. POGGETTO,
"Manager.''

Under the provisions of paragraph 18 of the marketing agreement, the contract theretofore executed between the plaintiff and Bardell and Oregoni became no longer effective and stood as a canceled instrument. Subsequent to the occurrences which we have just stated, two agents of the plaintiff named F. J. Campodonico and H. D. Jackson called upon the defendants, U. Bardell, G. B. Oregoni and Maria Oregoni, a number of times for the purpose of having them sign an instrument applying for a restoration of the canceled contract. The record shows that U. Bardell and G. B. Oregoni stated to the agents of the plaintiff that they would not sign an application for the restoration of the agreement, and that they did not care to again become members of the association. It appears, however, that the agents of the plaintiff called upon Maria Oregoni at a time when both U. Bardell and G. B. Oregoni were absent, and obtained her signature to the following instrument:

"California Canning Peach Growers,
 "California Street,
 "San Francisco, California.
"Gentlemen:

In the matter of my withdrawal in February of this year, from the association, I have decided to cancel the same and ask that my contract shall be restored. Please consider this letter as a notice and application to that effect, and greatly oblige.

 "Yours truly,
 "BARDELL & OREGONI,
 "Per MARIA OREGONI.
"Dated this 10 day of June, 1930."

Under date of June 13, 1930, the association wrote a letter addressed to Bardell & Oregoni, as follows (omitting the title):

"We wish to acknowledge receipt of your letter dated June 10, 1930, advising that you have rescinded your withdrawal action. In accordance with your instructions we have disregarded your letter of withdrawal, and therefore, your marketing agreement No. 2429, signed on June 11, 1938 (evidently intended to be '1928') remains in full force and effect. We appreciate very much your action in

this matter, and thanking you for your continued support, we are,

"Yours very truly,
"CALIFORNIA CANNING PEACH GROWERS
"By A. D. POGGETTO."

The trial court found that Maria Oregoni was not a partner with U. Bardell and G. B. Oregoni, in the raising and marketing of peaches, and likewise, that she was not authorized, as the agent of Bardell & Oregoni, to sign the application for a restoration of the rescinded marketing agreement which we have referred to herein.

The contention of the appellant is that Maria Oregoni is shown by the testimony to be a copartner in the raising and marketing of peaches with U. Bardell and G. B. Oregoni; that if not a partner, she was an authorized agent of the partnership to sign the paper purporting to request the restoration of the canceled agreement. It was further contended by the appellant that if Maria Oregoni was not authorized to sign the paper dated June 10, 1930, that her acts were subsequently ratified by U. Bardell and G. B. Oregoni, and also that the subsequent delivery of fruit by U. Bardell and G. B. Oregoni to the plaintiff, estops the defendants from denying the partnership relation, and also from denying the authority of Maria Oregoni to sign the name of Bardell & Oregoni, by herself, to the application for restoration of the marketing agreement. The complaint asks for a specific enforcement of the agreement, attorneys' fees and costs, and an injunction restraining the defendants from delivering peaches, other than as directed by the plaintiff-association.

While the contention of the appellant is presented in about a dozen different specifications, a determination of this appeal revolves around three questions: The authority of Maria Oregoni to bind U. Bardell and G. B. Oregoni, as their agent; the existence or nonexistence of a partnership relation between Maria Oregoni, U. Bardell and G. B. Oregoni, and the authority of Maria Oregoni to bind the partnership; and finally, was there any ratification by U. Bardell and G. B. Oregoni of the acts of Maria Oregoni so as to estop them from denying the restoration and binding effect of the marketing agreement executed June 11, 1928.

The court found that Maria Oregoni was not a member of the partnership; found that Maria Oregoni was the agent for the partnership in the usual and ordinary conduct of its business; found that Maria Oregoni was not authorized to sign the application for the restoration of the marketing agreement contract; and found also that the acts of U. Bardell and G. B. Oregoni did not constitute a ratification of the application signed by Maria Oregoni for the restoration of the marketing agreement; and that the defendants were not estopped to deny the claim of the appellant as to Maria Oregoni being a member of the partnership. If there is sufficient testimony in the record to support these findings, it is immaterial whether other findings challenged by the appellant may not be adequately supported, as these issues are determinative upon this appeal.

■ In considering the relationship and the authority of Maria Oregoni, it must be remembered that the record discloses no representations made by any of the defendants that Maria Oregoni was ever authorized to sign any agreements binding the partnership, nor were any representations ever made by any of the defendants to the plaintiffs, or to anyone else, that Maria Oregoni was a member of the partnership of Bardell & Oregoni. The defendants U. Bardell and G. B. Oregoni both denied the existence of any partnership relation with Maria Oregoni. Also denied that they had ever given Maria Oregoni authority to sign the request for the restoration of the marketing agreement. Both U. Bardell and G. B. Oregoni had stated to the agents of the plaintiff that they would not again become members of the association, and that after the cancellation of the agreement it was their purpose to sell peaches as best suited their business interests.

During the year 1930 the record shows that U. Bardell and L. B. Oregoni sold a limited quantity of peaches to the Sun Garden Canning Company under an agreement of sale. We have not figured up the quantity so sold, as that is immaterial. The agreement of sale was not, as claimed by appellant, signed by Maria Oregoni as one entering into the agreement. The record shows that the agreement was signed by U. Bardell and L. B. Oregoni, per Maria Oregoni. In none of the papers called to our attention

does the name of Maria Oregoni appear as a principal. Her name appears only as the person by whom the names of other persons are signed.

Commencing on August 10, 1930, and ending on or about September 6, 1930, Bardell & Oregoni delivered to the association approximately 133 tons of No. 1 canning peaches, varieties being "Paloras", "Homesteads" and "Phillips". On August 12, 1930, the association wrote a letter to Bardell & Oregoni in which it was stated that it had come to the attention of the association that they had endeavored to make disposition to others of canning peaches from the orchards, claimed by the association to be under the provisions of the alleged restored marketing agreement. It further appears that at the direction of the association, Bardell & Oregoni allowed 137½ tons of No. 1 "Cling" peaches to go to waste or drop to the ground during the year 1930.

▪ The record further shows that in demanding delivery of peaches by Bardell & Oregoni to the association, the association indicated that it would take legal proceedings against them in the event they did not deliver peaches to the association, and cause them considerable trouble and expense.

The argument advanced by the association that the association had no authority or legal right to accept peaches except under the terms of the marketing agreement, does not appear to us to have any bearing upon the issues involved in this action, as it does not tend in the least to establish either the authority of Maria Oregoni to bind the partnership, or to establish the fact of partnership. All it does establish is that the association asserted a title and right to the peaches and threatened action in the event that they were not delivered, and that the partnership did deliver at least 133 tons of peaches during the year 1930.

This brings us to the controverted question bearing upon the validity of the request for a restoration of the marketing agreement.

The record shows, as we have stated, that the signature of Maria Oregoni to this paper was obtained after the agents of the association had been notified by both U. Bardell and G. B. Oregoni that they would not sign the application for the restoration of the canceled contract. The

testimony also shows that the request for a restoration of the contract was prepared by the agents of the association, and the name of Bardell & Oregoni annexed thereto by the agents of the association, and Maria Oregoni's only act was to sign her name after the word "Per". This application was replied to in a letter dated June 13, 1930, set forth herein, but which we cannot find, from the record, was ever called to the attention of U. Bardell and G. B. Oregoni, other than appears from the testimony that Maria Oregoni, when she stated to U. Bardell and G. B. Oregoni that she had signed the application, they were angered by reason of her act.

The testimony relating to the understanding which Maria Oregoni had as to the terms of the application and its binding effect, is exceedingly lengthy and involved, too long to be set out herein. We may, however, set forth a limited portion thereof: "Q. How did you come to write your name there? What was said and done at the time? (This, in relation to the application for restoration.) A. They came and asked me about that, if Bardell & Oregoni would sign with the association, and I said 'no'. Then they asked me if I would sign it and I said 'no'. Q. Who did? A. Mr. Campodonico. I told him that they said they wanted to sell outside, and didn't want to go into the association. Then Mr. Campodonico told me that he would give me a paper, black and white, that I could ship and sell to anyone I wanted to; and at the same time he got the contract from his pocket and he read—I don't know—but he says, they made that paper—here—it is in black and white that you can ship and sell to anyone you want. Q. Was it a paper like this that he showed you? A. Yes sir. Q. What language did you speak? A. Italian. Q. You and Campodonico had a conversation in Italian? A. Yes sir. Q. Did he tell you that you could not sell or ship to canneries without the consent of the association? A. No, sir. Q. Just how long were they talking about it? A. Oh, maybe an hour. Q. Where were Mr. Bardell and Mr. Oregoni at the time? A. They were working on the ranch. Q. Did he tell you what that paper said—explain it to you? A. No sir. I told him after I signed this paper they might put me in jail, but he said, 'Sign it; it is all right.' I don't know what was in it. I signed that because I thought that I could

sell as I wanted to, and felt also that he was going to send me a contract so that I could show it to Bardell and my husband. Q. Some printed form, you mean? A. Yes. Q. Was there anything said about Campodonico giving you something in writing about shipping and selling? A. He told me to give him a sheet of paper, and that he would give it to me in white and black. Q. That he would give that to you in white and black? A. That I could sell and ship whatever I wanted to; and it was then he pulled out this paper that was in writing, that was there, that I could ship and sell as I wanted to. I was waiting for a paper, a contract like that. (Indicating exhibit No. 1.) They stated that that was so I could show it to Oregoni, my husband, and Mr. Bardell, but it was just as he stated to me. Q. Was there anything said about shipping fruit green or dried? A. No sir.''

The whole tenor of the testimony given by Maria Oregoni is to the effect that her understanding of the paper which she signed was such as did not preclude the selling of peaches outside of the association.

On behalf of the appellant, Campodonico testified as follows: ''Q. Now, I call your attention to plaintiff's exhibit No. 2 (being the application for restoration), and ask you if you have seen that before? A. Yes. Q. Where? A. At Bardell & Oregoni's dining room on the ranch, June 10. Q. Who was present? A. Mrs. Oregoni. Q. Anybody else? A. Mr. Jackson was with me; Mrs. Oregoni was alone. Q. And what conversation took place at that time? A. Well, at that time we came there to get the answer, whether she was going to join the association or not, and we signed her up that night. Q. What conversation took place, Mr. Campodonico? A. She discussed this contract with us, and said that she had signed the contract, and she wanted to ship some fruit green to some of the eastern firms—I don't know whether she mentioned the firms or not, but I said— . . . she discussed it very much about shipping, and I explained and read the paragraph to her, and she said—she did ask me—she wanted it in writing, and I said, I did not have to give it now in writing, but I said, 'It is in paragraph 12 here,' and I read it to her in Italian and explained it to her after I read it to her. Q. What was done with the paper after that? A. We took it to San Francisco and Mr.

Jackson gave it to the association. Q. Did she sign that? A. Yes, she signed that. Q. And the words, 'Bardell & Oregoni', whose handwriting is that? A. That is my handwriting, and the word 'per' there, too. Q. Mrs. Oregoni told you she did not want to sign this agreement unless she could ship or sell outside, did she? A. She said she wanted to ship green to the eastern market. Q. Did she say 'green', or did she say she wanted to ship or sell any place she wanted? A. She did not say that, because the contract would not let her. I explained that to her. Q. You told her she could sell to any cannery she wanted? A. I told her she could sell to any cannery that was satisfactory to the association. Q. And didn't you also tell her that you would give her a letter to that effect, and she could sell where she wanted? A. I did not. Q. Didn't you say, 'You can have that in black and white?' A. I did not offer to give it to her—she asked for it. Q. And what did she say? A. I told her, 'that is in paragraph 12'. I read it to her and explained it to her. I read it to her in English—she understands English.''

The same difference of understanding of the parties appears from the testimony at the time the appellant notified the defendants not to deliver any peaches other than to the association and controverts the claim of the appellant that U. Bardell and G. B. Oregoni, by their acts, ratified the restoration of the marketing agreement.

It appears from the testimony that Campodonico was told that while plaintiff did not have any right to a certain 18 acres of peaches, that the defendants, during the year 1930, had quantities of peaches, and that it could have 100 tons if desired, and the court found that the defendants did deliver to the plaintiff peaches pursuant to the request of the plaintiff, and not as a ratification of any agreement that had theretofore existed between the parties.

The record further shows that nearly all of the conversation was had with Maria Oregoni, rather than with the defendants U. Bardell and G. B. Oregoni, and that Mrs. Maria Oregoni used the singular pronoun in nearly all of her conversation. She spoke of doing this or that, without reference to the partnership or without reference to any authority given to her, and as found by the trial court, Mrs. Maria Oregoni was exceedingly voluble. We may here state that

while Mrs. Maria Oregoni signed the names of others, by herself, the record fails to show that the appellant made any inquiry whatever as to the authority of Maria Oregoni to bind U. Bardell and G. B. Oregoni by her actions.

The trial court found against the allegation of fraudulent conduct on the part of Campodonico and Jackson in procuring the signature of Maria Oregoni to the restoration request, after having failed to secure the signatures of U. Bardell and G. B. Oregoni. This finding, however, does not preclude what the record clearly shows, that Campodonico and Jackson obtained the signature of Maria Oregoni with knowledge of the fact that both U. Bardell and G. B. Oregoni were objecting thereto and were refusing to again become members of the association. This, under the authorities which we shall hereinafter cite, establishes the invalidity of the request for restoration and its lack of binding effect upon U. Bardell and G. B. Oregoni, even though a partnership relation, as to the peaches, existed between Maria Oregoni, U. Bardell and G. B. Oregoni.

Without quoting the testimony which would unduly extend the length of this opinion, it is sufficient to state that the peaches delivered by G. B. Oregoni and U. Bardell to the association during the year 1930, were delivered voluntarily and because of the fact that there was a surplus of peaches. That there was a large surplus is shown by the fact, as we have stated, that over 130 tons were allowed to go to waste.

There is considerable testimony in the record as to the reading and explanation of the letter written by Poggetto for the association, dated June 13, 1930, by a daughter of Maria Oregoni, and its explanation given by the daughter to Maria Oregoni, but there is no showing in the record that this letter was ever read or explained by the daughter to either U. Bardell or G. B. Oregoni. The daughter was educated in the local schools and appears to have been able to read and understand English very well. Not having been brought home to either U. Bardell or G. B. Oregoni, it has no binding effect upon either of them.

Again, there is no pretense that either U. Bardell or G. B. Oregoni ever represented to the association, or to the agents of the association, that Maria Oregoni had any power to make application for a restoration of the marketing agree-

ment, nor is there anything, as we have stated, in the record indicating that either U. Bardell or G. B. Oregoni ever represented that Maria Oregoni was a partner or had any authority to bind the partnership in the manner asserted by the appellant. This makes the following excerpt which we take from the opinion of the trial court pertinent: "If either Oregoni or Bardell had accepted the benefits of the marketing agreement, with full knowledge of its terms and conditions; or, if they had wilfully or from palpable negligence, permitted Mrs. Oregoni to pose as their authorized agent, or, if there had been no circumstances in the transaction between Mrs. Oregoni and plaintiff's agents tending to arouse their suspicion or put them on guard, the doctrine of ratification and estoppel could be justly invoked." (A clerical error appears in the quotation by the use of the word "any", which we have changed to the word "no", to express the intent of the court.) "But these factors are not present. In the first place, as previously pointed out, plaintiff was aware of the partnership, and had taken particular pains, when the original contract was signed, to see that one of the partners executed it. Moreover, the court is convinced that during negotiations with Jackson and Campodonico in the month of June, 1930, neither of the partners had the slightest idea that Mrs. Oregoni would sign the so-called reinstatement letter. The mere fact that she proved the most voluble of the three, and did most of the talking to Jackson and Campodonico is not the fault of Bardell or Oregoni. Neither of these defendants desired a renewal of the contract, and they were under no legal duty to inform plaintiff's agents of Mrs. Oregoni's disability. . . . And in this connection it may be pointed out that the plaintiff also had some responsibility in the matter, and if it chose to enter into negotiations with the woman, after having failed to interest the partners, it should not in good grace be permitted to complain of the resulting entanglements. It cannot be gainsaid, as the court has already pointed out, that the partners were opposed to a reinstatement of the contract. . . . Both Jackson and Campodonico testified that neither of the men would sign the letter, and that when Mrs. Oregoni signed it, both of them were absent." As an agent of the partnership Maria Oregoni

confessedly had no authority in writing to bring about the revival of the marketing agreement, as it was not to be performed within one year from the date thereof. (Sec. 1973, Code Civ. Proc.) Section 2309 of the Civil Code, relating to agency, limits authority as follows: "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing, can only be given by an instrument in writing." ▮ Nor does the first subdivision of section 2403 of the Civil Code assist the appellant upon this appeal. That section does provide that every partner is an agent of the partnership for the purpose of carrying on the business thereof and executing instruments for carrying on the business in the usual way, and may bind the members of the partnership, but there is a limiting provision in these words: "Unless the partner so acting has in fact no authority to act for the partnership in the particular manner, and the person with whom he is dealing has knowledge of the fact that he has no such authority."

Thus, in view of the fact that the appellant's agents had knowledge that U. Bardell and G. B. Oregoni objected to and had refused to sign any application for a restoration of the marketing agreement, the invalidity of the agreement as to them is not changed, even though the appellant's contention be correct that Maria Oregoni was in fact a member of the partnership. The agents of the appellant were acting with full notice, and when that is the case, the decisions supporting the rule that the objecting partners are not bound, are uniform.

In 47 C. J., page 833, the rule which we have just stated is set forth and amply supported by the decisions cited in the footnotes. It is there said, in substance, that where a third person deals with one of the partners, without notice to the contrary, he has a right to assume that the partner with whom he is dealing has authority, but where such third person has notice, he is bound by the limitations placed upon the powers of the partner with whom he is acting.

In 20 Ruling Case Law, page 887, section 98, we find the following: "When a partner gives to a third person notice that he will not be bound by the acts of his copartner, this amounts to a notice that the implied agency has ceased, and

such partner will then not be bound by a contract entered into by his copartner, although the fruits of the contract have been enjoyed by the partnership of which he is a member.'' This quotation from Ruling Case Law is approved in the case of *Bank of Bellbuckle* v. *Mason*, 139 Tenn. 659 [202 S. W. 931], where the rule with which we are now dealing is fully discussed and set forth, and it is there held that an instrument given to a third person having notice of the objections of other partners, is valid only as to the partner signing the instrument.

The same rule is supported in *Dawson, Blakemore & Co.* v. *Elrod*, 105 Ky. 624 [49 S. W. 465, 88 Am. St. Rep. 320]. We quote from the syllabus in that case as follows: ''A person selling goods to one partner on credit cannot bind the other partner after notice that he will not be bound, and this, though the goods come to the firm and are used by it.''

In *Monroe* v. *Conner et al.*, 15 Me. 178 [32 Am. Dec. 148], the same rule is followed, and it is held: ''That one partner is not bound by a contract entered into by his copartner after giving actual notice to the party proposing to make it, that he will not be bound thereby, although the fruits of the contract have been enjoyed by the partnership of which he is a member.''

In the case at bar, as we have said, the appellant's agents, after having failed to secure the signatures of U. Bardell and G. B. Oregoni to the request for reinstatement of the marketing agreement, and after they had been told by both of the partners that they would not again become members of the association, obtained the signature of Maria Oregoni in the manner which we have stated, and therefore must be held to have obtained her signature with full knowledge of the objections of U. Bardell and G. B. Oregoni, and yet, so far as the record shows, made no inquiry as to who were the persons actually constituting the partnership of Bardell & Oregoni, nor did they make any inquiry as to the authority of Maria Oregoni to sign her name to the application for reinstatement, purporting to sign the name of Bardell & Oregoni, by herself. Under such circumstances, no plea of estoppel can be allowed.

While we have not followed the chronological order of the reasons urged by the appellant for reversal, which would

have unduly extended the length of this opinion, we have considered them all.

The judgment is affirmed.

Pullen, P. J., and Thompson, J., concurred.