[Sac. No. 5102. In Bank.—April 22, 1938.]

CALIFORNIA CANNING PEACH GROWERS (a Nonprofit Cooperative Association), Appellant, v. W. P. HARKEY et al., Respondents.

Agnew & Boekel, Carroll Single and J. Francis Good for Appellant.

Richard W. Young, Floyd B. Cerini and F. X. Kerner, as *Amici Curiae,* on Behalf of Appellant.

Seth Millington and Jerome D. Peters for Respondents.

THE COURT.—This action was commenced by plaintiff, California Canning Peach Growers, a non-profit cooperative association, against defendants for the purpose of having its rights declared under a written agreement alleged to have been entered into between the association and defendants. Defendants Harkey answered setting up their interpretation of the transaction, and cross-complained for certain sums alleged to be due from the association to them. The Harter Packing Company was originally made a defendant, but upon paying certain sums into court, by consent of all concerned, was dismissed from the action. During the course of the trial the parties stipulated as to the exact sums that would be due one to the other depending upon which interpretation of the contract was accepted by the trial court. The trial court decided in favor of the Harkeys, and judgment was entered in their favor in the amount stipulated to by the parties. From that judgment plaintiff appeals.

This appeal is but one of four appeals now under submission in this court dealing with the rights of the association against various peach growers with whom it contracted. The other three causes are *Stafford* v. *California Canning Peach Growers,* S. F. 15839, *post,* p. 212 [78 Pac. (2d) 1150], *California Canning Peach Growers* v. *E. R. and F. O. Williams,* Sac. 5179, *post,* p. 221 [78 Pac. (2d) 1154], and *California Canning Peach Growers* v. *Poggetto and Williams,* S. F. 15906, *post,* p. 233 [78 Pac. (2d) 1161]. The general facts out of which these four controversies have arisen are the same for all of the cases. These general facts will be set forth in full in this opinion and will not be repeated, except where necessary, in the other three opinions, but should be considered as applicable to those appeals. The facts peculiar to each case and the law applicable to those facts will be set forth separately in each opinion.

It should be mentioned that in all four cases, the trial courts (all four cases were tried before different trial judges) rendered judgment against the association. The evidence on some of the points was conflicting. In accordance with the usual rule on appeal the evidence hereafter stated is that most favorable to the respondents.

### General Facts.

The association was organized as a non-profit cooperative marketing association in the year 1921 under the then existing provisions of title XXI of the Civil Code. At that time articles of incorporation and by-laws were adopted providing for the manner of conducting the business of the association. In the by-laws there was set forth *in haec verba* a form of marketing agreement which each member was to sign. The general legal effect of the by-laws and the marketing agreement has been considered by the appellate courts in *California Canning Peach Growers* v. *Downey,* 76 Cal. App. 1 [243 Pac. 679], *California Canning Peach Growers* v. *Harris,* 91 Cal. App. 654 [267 Pac. 572], and *California Canning Peach Growers* v. *Bardell & Oregoni,* 132 Cal. App. 153 [22 Pac. (2d) 764].

The articles of incorporation are quite general in their provisions. Among other things it is therein provided that the purposes of the association are to promote, foster and encourage the producing, preparing for market and marketing of canning peaches; to engage in the production, preparing for market and marketing of such peaches; to furnish facilities through which canning peaches shall be prepared for market and marketed upon a uniform plan; to encourage its members in the production of better qualities of canning peaches; to find the readiest and most available markets for its members, and to purchase and sell the canning peaches produced by its members; to enter into contracts with its members for the purchase by it of the canning peaches produced or to be produced by its members; to enter into contracts with the members for the handling and marketing of peaches by the association as their agent; "to do each and everything necessary, suitable or proper for the accomplishment of any of the purposes herein enumerated or which shall at any time appear conducive to or expedient for the benefit of this association or its members". It is obvious from these provisions, and from a fair reading of the articles as a whole, that the main purpose of the association was to handle the peaches of its members on a cooperative basis, but it is to be noted that there is nothing contained in the articles that would prohibit the association from classifying its membership, or in fact from dealing with non-members, if so to do were in the best interests of its members.

The by-laws were more explicit. They prohibited any dealings with non-members and likewise prohibited any classification of the membership. Among other things, they provided that the association was organized for the purpose of mutual help, for the purpose of serving its members only; that any person, firm or corporation engaged in the production of canning peaches or owning or leasing lands on which canning peaches are grown, may be admitted to the association and shall have voting power and property rights therein on the same basis as all other members; that all of the members agree to abide by all of the rules of the association with reference to the production, handling and marketing of their product as provided in the by-laws or as may hereafter be determined either by ·amendment of the by-laws or by resolution of the board of directors; that all members will sign standard marketing agreements from time to time; the present standard marketing agreement is attached and made a part hereof, and all other standard marketing agreements will be similar thereto in all substantial points; that all members shall be bound by all of the terms of any such agreements; that the voting power of the members of the association shall be equal; that the property rights and interests of the members in the property of the association shall be equal; that all new members shall be admitted on the same basis as all other members; that each member must agree to market the canning peaches grown or owned by him in accordance with the provisions of the standard marketing agreement.

The standard marketing agreement incorporated in the by-laws requires the owner or grower of peaches from the date of execution to 1936 to sell to the association all the canning peaches grown on the lands described in the agreement. It is conceded by all concerned that a grower owning more than one orchard could sign up with the association as to any or all of his orchards, but that the mere fact that he had signed up as to one orchard did not require him to market the peaches from his other orchards through the association. The marketing agreement provides for the pooling of all peaches of like grade and kind, the price to be paid to the grower to be the average or pooled price; that after deducting the expenses, the association will pay the growers the proceeds of all of the sales made by it less an "Association charge

not to exceed 5% of the gross sales. From this 5%, organization and other general Association expenses, shall be deducted, and with the balance a commercial reserve shall be created.'' This 5 per cent withholding fund was not intended to be used to defray the ordinary expenses of the association. The ordinary expenses were paid from a handling charge of $1.50 per ton allowed to the association by the commercial canners to whom the association sold its fruit. In other words, after the market price to be paid by the canners to the association had been fixed, the association would receive from the canners an additional $1.50 per ton as a handling charge. The 5 per cent fund was intended as a reserve, and to take care of any losses of the association. This reserve in the last few years was entirely used to defray losses incurred in the canning activities of the association. It was intended that this 5 per cent should be withheld from the growers for three years (later extended to five) and then paid to the growers if any portion remained after deducting losses. To illustrate: If the market price for peaches was fixed at $30 per ton, the association would actually receive $31.50 per ton from the canners. The $1.50 per ton carrying charge was applied to the operating costs of the association. The grower, in such a year, would receive but $28.50 per ton— $30 less 5 per cent. This 5 per cent, it was intended should be kept as a reserve, and paid to the grower at the end of a definite period if any portion remained after deducting losses.

The marketing agreement expressly provides that the association ''will not buy or deal in any peaches except under contracts similar to this contract''. It also provides, as do the by-laws, for liquidated damages of 50 per cent of the market price of the grower's crop in the event of breach by the grower. The agreement purports to cover the period from the date of execution to 1936, but provides that the grower and his lands shall be released from the contract in the event of a *bona fide* sale of the lands subject to the contract, and likewise permits the grower to withdraw from the association in any even numbered year by serving upon the association a written notice of withdrawal as provided in the contract.

The above summary of the by-laws clearly indicates that they prohibited the association from classifying its membership, or from dealing in the peaches of non-members.

Some reference should also be made to the statutory law governing such associations. By the provisions of section 653sb of the Civil Code as added in 1921 and as in effect when the appellant was incorporated, the association was expressly prohibited from dealing with non-members in products similar to products handled for its members. In 1923 this section was amended to provide that any cooperative association formed under title XXI may "use or employ any of its facilities for any purpose, provided the proceeds arising from such use and employment shall go to reduce the cost of operation for its members; and provided, further, that products of non-members, similar to the products handled · for its members, shall not be dealt in to an amount greater in value than such as are handled by it for members". In 1931 title XXI was repealed and all such cooperatives by the provisions of section 653vv of the Civil Code were placed under title XXIII, that section providing that all previously incorporated cooperatives "shall be deemed organized and existing under and by virtue of the terms of this act and all of the provisions of the terms of this act, and any of the restrictions and benefits thereof shall apply in all of their terms to such corporation". One of the sections in title XXIII of the Civil Code thus made applicable to this appellant was section 653ff which, as amended in 1927, in enumerating the powers of such associations, in subsection "i" conferred upon the association exactly the same powers that had been conferred upon it in 1923 by the amendment to section 653sb *supra.* In 1933 the legislature adopted the Agricultural Code, and in section 1194 reenacted the exact provisions of section 653ff subsection "i" of the Civil Code above referred to.

This statutory history reflects a change in legislative policy towards the powers of such cooperatives of considerable importance on these appeals. Until 1923 it was believed that such associations should deal only with the products of its members, and that all members should be treated equally. In 1923 and thereafter this policy was changed to authorize unequal treatment and to permit dealings with non-members. This change in legislative policy towards the powers of such cooperatives was based on the fact that experience had demonstrated that the two main classes of growers —owners and renters—had fundamentally different problems to face, and that a policy favorable to owner growers

would not interest renter growers. The evidence in the present cases demonstrates that many tenants growing peaches on lands rented from others refused to join the association. Most of these tenants rented only from year to year, were always in need of cash, and most of them were required to pay their rentals at the close of the peach season. They had no interest in a long time policy beneficial to the peach industry as a whole. They were unwilling to enter the association under a contract whereby 5 per cent of the gross purchase price was to be withheld from them for a period of from three to five years, particularly when they could sell directly to commercial canners for cash at the same or better price. The fact that a large number of renters of peach orchards refused to enter the association had several bad effects on the association's affairs. Obviously, the efficacy of the cooperative plan partially depends on the quantity of the crop the cooperative controls. With a large independent block of peaches owned by renters hanging over the market the bargaining power of the association with the commercial canners was materially reduced. If this independent block could be reduced and added to the association's peaches, the association would be in a better bargaining position and would secure a better price for all of its fruit, including the fruit of its regular members. The evidence shows that the canners were well aware of the advantages to them of the existence of this independent block of fruit. They used this block of renters' fruit as a club over the head of the association to drive the market price down. They frequently offered various valuable inducements to renters, such as free box rent and roadside delivery to keep this fruit out of the association. Many owners of peach orchards refused to become members, fearing their inability to rent their orchards if the orchard was signed up with the association. The association, particularly in 1923, was seriously handicapped because of its inability to control the renters' peaches. Under such circumstances the board of directors of the association met in regular session on January 15, 1924, to discuss the problem. After full discussion, the board, all members being present, unanimously passed a resolution "that the management be authorized to accept marketing agreements from any and all renter members on the basis that any such renter members will be paid in full for the

peaches delivered as soon as the harvesting season is over, and that the only charge to be made to such renter members for the handling of their crop would be the annual dues of 25c per ton''. The authenticity of this resolution is challenged in several of the cases, the association claiming the minutes for the date in question were forged. The overwhelming weight of the evidence supports the findings that such resolution was in fact passed.

By this resolution the board of directors authorized the management to deal with renters on a basis materially different from that provided for in the marketing agreement applicable to regular members. Under this resolution the management was authorized to buy renters' fruit at market price less 25c per ton, and to pay for the same at the close of the harvesting season. Under the by-laws and the marketing agreement regular members received payment later, and received market price less expenses and less 5 per cent of the market price withheld as above set forth. Moreover, renters were not to share in any losses or profits of the association as were regular members.

Although, in one sense, this resolution authorized the management to confer a benefit on renters not accorded regular members, there were various material benefits that accrued to the association and its regular members from such an arrangement. In the first place, to the extent that renters signed up, it cut down the independent block of fruit and increased the association's bargaining position. The evidence shows that this enabled the association to secure a better price for all of its fruit. This, of course, benefited all regular members. In the second place, the association made a profit of $1.75 on every ton of renters' fruit sold to the canners— the 25c per ton carrying charge, and the $1.50 per ton handling charge allowed by the canners to the association for all fruit bought from the association. This income was used to partially defray the association's general expenses, thus benefiting all regular members. In the third place, the evidence shows that the association, in addition to selling peaches to the commercial canners, canned a proportion of its fruit. The renters' fruit permitted the association to enlarge its canning operations, to reduce its per case overhead and canning cost. This benefited all regular members.

Another fact should be here mentioned. The evidence introduced in these cases demonstrates that the fruit the association purchased under contracts entered into pursuant .to the renter resolution was fruit that the association could not and would not have received under a regular member's contract. None of the respondents would have sold the fruit involved in these cases to the association under a regular member's contract.

There can be no doubt that the resolution of January 15, 1924, violated the by-laws of the association, but we are of the opinion that such resolution did not violate the general provisions of the articles of incorporation above referred to. Although there is no direct evidence on the point, it is a reasonable inference that the board in passing the resolution believed that the statutory changes occurring in 1923 authorized the board, without amendment of the by-laws, to enter into the type of contracts authorized by the resolution.

It was the passage of this resolution, and the actions of the association under it, that furnishes the background for these four actions. The evidence discloses that from 1924 to 1935 A. D. Poggetto was general manager, and Frank B. Schmitt was assistant secretary, in fact executive secretary, of the association, and that these two officers were the authorized managing agents of the association. It appears without conflict that, after the resolution was passed, these two managing officers authorized and instructed the field agents of the association to solicit renters of peach orchards, and to sign them up if possible in accordance with the terms of that resolution; that from 1924 to June of 1935 many such renters were signed up; that during those years (with the exception of 1935) the association, for the most part, lived up to its side of the bargain and paid the renter members thus contracted with on the basis set forth in the 1924 resolution. The evidence also discloses that early in 1935 some of the regular members became dissatisfied with the activities of the then existing board of directors. Whether this dissatisfaction was based on the activities of the management in authorizing renter member contracts, or was largely based on the fact that large losses had been incurred in the canning activities of the association, does not clearly appear. An investigation was made and litigation started. This resulted, in June of 1935, in the calling of a special election to elect a new board

of directors. As a result of that election a majority of the old board was displaced, and a new board elected. This resulted in the resignation or release of some of the former employees and agents of the association, including Poggetto and Schmitt, both of whom resigned. The new board determined to repudiate the actions of its managing agents under the 1924 resolution, although the record does not disclose that the new board ever formally repudiated or rescinded the resolution. In fact, in *California Canning Peach Growers* v. *Poggetto and Williams,* S. F. 15906, *post,* p. 233 [78 Pac. (2d) 1161], the record discloses that the new board by resolution expressly authorized payment to many renters for their 1934 crop on a renter member basis thus ratifying renter member deals with these members. At any rate, after the new board was elected, the association demanded from some of its renter members that they refund the alleged overpayments paid to them under the 1924 resolution, and demanded that thereafter the so-called renter members deliver their peaches to the association under regular member contracts. The refusal of the renter members to comply with these demands has resulted in the four actions here involved, and in others pending in other courts.

The association takes the position that even if the association did enter into renter member contracts with respondents under the resolution of January 15, 1924, that resolution was *ultra vires* and illegal, and all renter members, and particularly respondents, were fully aware of this fact at the time they contracted with the association. In the second place, the association contends that the actual contracts signed by respondents were regular member contracts, that the renter member ''preference'' was based solely on oral contracts entered into between the association and respondents, and that the parol evidence rule prohibits the introduction of any evidence of this oral contract. This last contention is made possible because of the procedure followed by the management in signing up so-called renter members. As already pointed out, the by-laws contain a form of marketing agreement—a form adopted in 1921 and obviously applicable only to regular members. That form expressly provides for the withholding of 5 per cent of the market price, and contains various provisions that could not reasonably apply to renter members. After a prospective renter member had

been solicited by the field agents of the association, and after such agent had fully disclosed to such prospect the terms of the 1924 resolution, and the terms under which the association proposed to buy the renter's fruit, most of such prospects, and all of the respondents here involved, then took the matter up directly with Poggetto or Schmitt, or both. These managing agents would then again explain to the prospect the terms of the 1924 resolution and the terms under which the association proposed to purchase the renter's fruit. It is admitted by the association, there being no evidence to the contrary, that Poggetto or Schmitt, and the field agents, unequivocally and positively offered to buy the respondents' fruit for market price less 25c per ton payable at the close of the season. It also appears without conflict that each of the respondents refused to deal with the association on the regular member basis. After the two contracting parties had arrived at an oral agreement in accordance with the terms of the 1924 resolution, Poggetto or Schmitt or both would present to the renter member a regular member contract for signature. (This procedure was not followed in the Harkey case as will hereafter appear in the discussion of the facts of that case.) ▮ The managing agents then represented to the renter that the regular member contract was the only form of contract available; that it should be executed; that at the time of execution or thereafter the association would place the words ''renter member'' or some equivalent on the cover of the contract; that the renter member would be entered in the books of the association as a renter member; that by placing these words on the cover of the contract and by the entry in the books, that contract would then come under the terms of the 1924 resolution; that thereafter the association would pay the renter member in accordance with the 1924 resolution and in accordance with the agreement of the parties. Upon these representations the renter would execute the contract. The association contends that contracts so entered into were regular member contracts; that the agreement as to payment of market price less 25c per ton was purely oral and was contrary to the written contract; that to show the existence of such oral contract violates the parol evidence rule.

It should be mentioned that there is no dispute but that at the time of contracting both parties intended, in good faith,

to enter into a contract in accordance with the 1924 resolution, and both parties intended, in good faith, that the contract that was executed should have that legal effect. There is also no dispute but that each of the respondents knew that the contract they executed contained a clause providing for the withholding of 5 per cent of the purchase price of the peaches, and contained other provisions inconsistent with the 1924 resolution. We are thus presented with the unusual situation where the two contracting parties to each of the contracts here involved both agree as to their intent, both admit all of the negotiations without conflict, both knew what they intended, and both lived up to their mutual understanding for many years. Now one of the contracting parties seeks to repudiate that agreement, not as to the future alone but as to past transactions most of which have been fully executed, on the grounds heretofore stated.

Another general contention of appellant association should be here referred to. Throughout its briefs appellant contends that the existence of such renter member contracts was kept secret from the general membership, and seeks by inference to imply that there was some sort of a conspiracy on the part of its officers to grant preferences to a favored few. The trial courts found on ample and sufficient evidence, and on what we consider the weight of the evidence, that no such secrecy was maintained. The evidence shows that the renter member situation was frequently the subject of discussion by the members of the board of directors and that the fact that the association was willing to enter into such contracts was widely known among renters of peach orchards throughout the state.

*Facts and Law Applicable to Harkey Case, Sac. 5102.*

Defendant W. S. Harkey is the father of defendant W. P. Harkey. The son owned a 35-acre ranch of which but 5 acres were planted to canning peaches. The father owned a ranch of which 55 acres were planted to canning peaches. Both of the Harkeys were influential members of the community in which they lived, and the association was particularly anxious to sign them up as members because of the influence it would have on other growers in the community. Until 1933 both had refused to join the association as regular members. The elder Harkey at that time was quite an old man and no longer directly operated his orchard. The evi-

dence shows that in 1933 and 1934, and for some time prior thereto, the son was a tenant of the father, operating the father's peach orchard under an oral lease calling for a percentage of the proceeds as rental. The son had no authority to dispose of the peaches of this ranch without his father's consent. In February, 1933, one of the field agents of the association again approached the younger Harkey, to solicit his membership in the association. Harkey evidenced a willingness to become a regular member as to the 5 acres owned by him, and explained his relationship to his father as to the 55 acres owned by the father. The possibility of the father's 55 acres coming into the association under the renter member resolution, inasmuch as those acres were rented by the younger Harkey, was discussed between the field representatives and Harkey. Thereafter young Harkey discussed the matter with assistant secretary Schmitt. Schmitt explained the terms of the 1924 resolution. After some discussion he suggested that the son should come into the association as a regular member as to his 35 acres only 5 acres of which were devoted to the growing of peaches, and that as to the 55 acres owned by the father and rented by the son, the association would buy that fruit on a year to year oral contract on the basis set forth in the 1924 resolution. The son agreed to both propositions. The father later ratified his son's acts. Thereafter the son signed a regular contract, which, in the body of the contract, described the 35 acres owned by the son, and which in no way referred to the 55 acres owned by the father. Thereafter Schmitt, or some other association agent, or the field agent, caused to be placed on the cover of the contract under the printed heading contained thereon, "Memo. of Acreage", a description not only of the 5 acres owned by the son but also of the 55 acres owned by the father. The son testified that this was not in the contract when he signed it. The testimony of the agents of the appellant is that this was done for reference purposes only so as to disclose to the office staff that the association was to receive peaches from the son from 60 acres—5 acres under the written contract, and 55 acres under the oral contract.

In the year 1933 the Harkeys delivered all of their peaches to the association, and they were paid in exact accordance with their agreements—that is, the son receiving market price less 5 per cent as called for in the written agreement per-

taining to his 5 acres, and the father and son receiving market price less 25c per ton as called for in the oral agreement pertaining to the 55 acres. There is some dispute concerning this in the record, because of the confusing method of bookkeeping employed by the association, but the trial court so found and the weight of the evidence supports this finding.

In 1934, the arrangement for 1933 having been carried out by all the parties to the satisfaction of all, the Harkeys again delivered all of their fruit to the association under their agreements. The association, however, was unable to pay for such peaches at the close of the season, for the reason that it had canned a substantial portion of its fruit and could not pay its creditors until this canned fruit was sold. Ultimately the full amount for the son's 5 acres on a regular member basis was paid, but the full amount of the money due for the 55 acres of fruit under the oral contract was never paid. The balance due, computed on the renter member basis in accordance with the oral contract, is the basis of part of the cross-complaint of the Harkeys, and is likewise the basis for part of the judgment rendered in their favor.

Early in 1935, as already pointed out, litigation was commenced by some dissatisfied members of the association which was ultimately settled in June of 1935 by the election of a new board of directors. While this litigation was pending and before the election had been held, on June 5, 1935, W. S. Harkey wrote a letter to the association, which letter reads in part as follows:

"My son, W. P. Harkey signed an application for membership in the California Canning Peach Growers and apparently there has been included in it approximately sixty (60) acres that belong to me and in which he has no interest, he being only the owner of approximately five (5) acres of peaches . . .

"The peaches belonging to me do not belong in the association and I am writing this letter that I am not a member, did not authorize any peaches being included and if you anticipate handling my peaches this year, to correct you."

Under date of June 14, 1935, Manager Poggetto replied to this letter in part as follows:

"We have been aware of the facts as explained in your letter concerning your peach acreage. The association has no claim on any peaches produced on acreage belonging to you

and so far as the association is concerned you are free to dispose of the peaches in any manner you see fit.

"We have a contract covering the acreage of your son, Mr. W. P. Harkey, and, of course, deliveries from that acreage must be made to the association in accordance with the terms and conditions of our Marketing Agreement."

After receiving confirmation from Poggetto concerning the cancellation of the oral contract, W. P. Harkey, in company with his attorney who was also a renter member, visited the association's offices in San Francisco. They conferred with the general manager and assistant secretary. During the discussion the Harkey contract was secured from the association's files, and it was then discovered that although the body of the contract properly described the 35 acres owned by W. P. Harkey (only 5 of which were devoted to the growing of canning peaches) the memorandum of acreage on the cover of the contract contained a reference to the 55 acres owned by W. S. Harkey. Millington, the Harkeys' attorney, expressed the fear that, if a receiver were appointed for the association in the litigation then pending, some confusion might be created by that memorandum. Poggetto explained the circumstances under which that memorandum had been made, and the reasons for making it, but Millington and W. P. Harkey insisted that the cover of the contract be changed to accord with the body of the contract and with the true facts. After some discussion the officers of the association acceded to this request. They caused the original contract to be cancelled and destroyed, and a new written contract to be executed, which was dated the same date as the original contract. This new contract was an exact copy of the original, except that the memorandum on the cover was made to agree with the description of acreage contained in the body of the contract.

Appellant challenges the above statement of facts in reference to the execution of the second contract and the writing of the letter of June 14th, as being inconsistent with certain other evidence introduced by it. An examination of the record discloses that the facts as above stated are in accord with the weight of the evidence. Appellant also seeks to imply an evil motive on the part of Poggetto and Schmitt, its managing agents, in writing the letter of June 14th and in causing the written agreement to be re-executed and dated back. It

is a sufficient answer to this contention to point out that this is not an action against former officials of the company for malfeasance in office, but an action against third parties for breach of contract, and to recover alleged overpayments. A reading of the transcript discloses that contained therein is no semblance of a showing of any conspiracy between Poggetto and Schmitt and the Harkeys to defraud the association. The evidence overwhelmingly demonstrates that these two officials in this transaction at all times acted in good faith. They were attempting to live up to the contracts entered into with the Harkeys by them as the managing agents of the association. Their entire course of action was directed towards this end.

After notifying the association of the cancellation of the oral contract dealing with the 55 acres, the Harkeys sold the peaches grown on this acreage in 1935 to the Harter Packing Company. The son delivered the peaches grown on his 5 acres to the association under his written contract. It should be here mentioned that the son, as to his 5 acres, has at all times admitted that this acreage was covered by the written agreement, and that as to that acreage he is a regular member of the association. He has at all times performed all obligations imposed upon him by that agreement.

As already indicated this action was instituted by the association to secure a declaration of the rights of the association under the Harkey contract, it being its contention that the written contract covered the entire 60 acres under a regular member contract. The association seeks to recover back overpayments for the year 1933 as to the 55 acres, made on a renter member basis, a declaration that the Harkeys be paid as to this acreage for 1934 on a regular member basis, and damages of 50 per cent of the market price for failure to deliver in 1935. The Harkeys cross-complained for the balance due them for 1934 under the oral agreement on a renter member basis, and the son demanded the balance due him on his 1935 deliveries on a regular member basis. After a protracted trial the lower court entered judgment in accordance with the contentions of the Harkeys in the amount stipulated to by the parties. From this judgment the association has appealed.

The briefs of the parties cover a wide field and discuss many questions not properly here involved. Appellant chal-

lenges many of the findings as being unsupported. No useful purpose would be served in further discussion of these factual contentions. The facts heretofore recited in this opinion are in accordance with the findings, and all such facts are amply supported by the record.

One of appellant's main points on this appeal is that the original written contract as executed in 1933 covered the entire 60 acres of peach land owned by the Harkeys; that this written agreement was an ordinary marketing agreement making W. P. Harkey a regular member of the association; that the agreement to treat the 55 acres on a renter member basis was entirely oral, that to permit evidence of the alleged oral agreement violates the parol evidence rule. The point is without merit. The trial court, on sufficient evidence, found the existence of two separate and distinct contracts— a written contract as to the five acres, and an oral contract as to the 55 acres. This finding is supported not only by the testimony of respondents, but also by the testimony of the agents of appellant who negotiated the contracts. The method of bookkeeping employed by the association, from which appellant seeks to imply a contrary inference, cannot affect the rights of the Harkeys who had no knowledge thereof nor control of the books.

The contention that the letter of June 5, 1935, signed by W. S. Harkey, and above quoted, conceded that the original contract included his acreage, and that the only ground assigned therein for seeking cancellation was that W. P. Harkey had no authority to deal with this acreage, is incorrect. There is no room for the principle enunciated in *Ohio & M. Railroad Co.* v. *McCarthy*, 96 U. S. 258, 267 [24 L. Ed. 693], and similar cases that "where a party gives a reason for his conduct and decision touching anything in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration". The letter of June 5th did not concede that the 55 acres were covered by the written agreement. On this point the letter stated that "apparently there has been included in it (the son's written contract) approximately sixty (60) acres that belong to me", etc. The wording is ambiguous, and the parol evidence properly admissible to explain the ambiguity, demonstrates clearly the meaning of the phrase— he was referring to the memorandum on the cover of his

son's contract which erroneously referred to W. S. Harkey's 55 acres. In stating that his son had no authority to sign up his 55 acres under a regular member's contract, he was simply stating the fact. Under such circumstances, as far as the present point is concerned, we are presented with a simple proposition—a written regular member contract to buy and sell 5 acres of peaches, and a second separate and distinct oral contract to buy and sell 55 acres of peaches on a year to year basis. There is, of course, no violation of the parol evidence rule in showing the existence and terms of an oral contract by parol.

█ We are next presented with the legal question as to the legal effect of the oral contract in view of the fact that the by-laws of the corporation prohibited classification of the membership or dealings with non-members. As already pointed out, the articles of incorporation are general and broad enough in their language to authorize the directors in passing the resolution of January, 1924. On the other hand, as already pointed out, the by-laws as drafted in 1921 and the provisions of the marketing agreement incorporated therein, were based on the theory of equality of burdens and equality of profits. (*Taresh* v. *California Canning Peach Growers*, 3 Cal. (2d) 686 [45 Pac. (2d) 964]; *California Canning Peach Growers* v. *Downey*, 76 Cal. App. 1 [243 Pac. 679].) It is also true that the by-laws expressly provided for their amendment by majority vote of the members, and that such by-laws could not be properly amended by resolution of the board of directors. (*Noble* v. *California P. & A. Growers Assn.*, 98 Cal. App. 230 [276 Pac. 636].) The resolution of January 15, 1924, therefore, when passed, was in excess of the powers of the board of directors. However, the policy embodied in that resolution did not violate the provisions of any statute nor were its provisions illegal as violative of public policy. It was simply *ultra vires* the by-laws. In fact, not only was the policy of the resolution not illegal or violative of any public policy, but its general policy was in accord with the legislative policy as indicated by the amendment to section 653sb of the Civil Code in 1923. That this continued to be the legislative policy is indicated by the amendment to section 653ff of the Civil Code in 1927, and section 1194 of the Agricultural Code adopted in 1933. These facts serve to distinguish this case from *Kansas Wheat*

*Growers' Assn.* v. *Rowan*, 125 Kan. 710 [266 Pac. 101], so strongly relied on by appellant. In that case a farmer signed a regular member contract and then refused to deliver his wheat in accordance with the terms of that contract. When sued for breach of contract he defended on the ground that the contract had been secured through the fraudulent representations of the association's agent. The fraudulent representation relied upon was made orally by a field agent of the association and was to the effect that if Rowan would sign a membership contract the association was empowered to and would lend him money to pay his debts at 6 per cent interest. In holding that Rowan was not legally justified in relying on this representation, the court pointed out that the lending of money would violate not only the by-laws of the company, but also its charter, and likewise would be in direct violation of certain statutes of the state. The court held that Rowan was not justified in relying on the representations of the field agent and stated (p. 103): "Before he had a right to rely on the representations, he must have had a legally adequate reason to believe that the agent was authorized to make them." The situation there involved is radically different from that presented in the instant case. Here the articles of incorporation did not prohibit the line of activity outlined in the resolution. The statute under which the association had been incorporated was expressly amended to permit such activities. We are not here dealing with assumption of authority by a mere field agent, but with a formal resolution of the board of directors, authorizing its managing agents to enter into such contracts. The managing agents of the association, clothed with broad powers, represented to respondents that they had the authority in question. ■ It is true, as urged by appellant, that W. P. Harkey in becoming a regular member, became chargeable with knowledge of the provisions of the by-laws, but he certainly cannot be charged with greater knowledge than that possessed by the board of directors and the managing agents of the association, and they certainly believed and represented that they had the power in question.

■ Assuming that the oral contract was *ultra vires* the by-laws, the association can claim no greater rights by reason of that fact than any other corporation could claim under similar circumstances. The appellant claims that the law

applicable to *ultra vires* contracts of corporations generally does not apply to cooperatives. Section 1219 of the Agricultural Code (based on old Civil Code section 653xx) provides that "The general corporation laws of this State and all powers and rights thereunder, shall apply to the associations organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of this chapter." No such conflicting or inconsistent provision in reference to the problem here under discussion has been referred to by appellant.

 It is quite clear that an ordinary commercial corporation could not secure the relief here asked by the appellant. The transactions here involved have been entirely executed, or at least fully performed by respondents. The association is not asking to be relieved of an executory contract claimed to be *ultra vires*. It is asking that as to the 55 acres the Harkeys be compelled to live up to and perform the obligations of a regular member contract—a contract, which as to that acreage, they admittedly never signed. Nor is the association seeking to rescind an *ultra vires* contract. It is asking that as to 1933 and 1934 the Harkeys be compelled to return moneys paid to them in exact accordance with the oral agreement of the parties, on the ground that they are bound by a regular member contract which admittedly they never signed or agreed to. The association has made no tender of a return of the material benefits it has received. As to the year 1935 it is seeking not only to enforce the provisions of a contract contrary to the one entered into, but is seeking to enforce that contract after its managing agents in writing had informed W. S. Harkey that he was released from all liability to deliver to the association, and that the association claimed no rights in his fruit. As early as the case of *Miners' Ditch Co.* v. *Zellerbach,* 37 Cal. 543 [99 Am. Dec. 300], it was held that the doctrine of *ultra vires,* at least in cases where the transaction did not violate the statutory law or public policy, did not apply to fully executed transactions. This is in accord with the general law on the subject. (See 14A Cor. Jur., p. 319, sec. 2168 and cases therein cited.)

 It is also settled in this state that where the contract is not *malum in se* or *malum prohibitum* the party who has fully performed (respondents here) may recover on the alleged *ultra vires* contract provided the other party (appellant

here) has received the benefits of the transaction. (*Main* v. *Casserly,* 67 Cal. 127 [7 Pac. 426]; *Kennedy* v. *California Sav. Bank,* 101 Cal. 495 [35 Pac. 1039, 40 Am. Rep. 69]; *Rabbitt* v. *Union Indemnity Co.,* 140 Cal. App. 575 [35 Pac. (2d) 1066].) Under such circumstances the doctrine of *ultra vires* can only be raised by the state. (*Chambers* v. *Security etc. Bank,* 51 Cal. App. 212 [196 Pac. 488]; *Bay City etc. Assn.* v. *Broad,* 136 Cal. 525 [69 Pac. 225]; *McKee* v. *Title Ins. etc. Co.,* 159 Cal. 206 [113 Pac. 140].)

On still another ground the doctrine of *ultra vires* in this and the other cases is not available to the association. Under the circumstances here existing the association is clearly estopped from so challenging the 1924 resolution. In principle, the problem presented is closely analogous to that under discussion in *Buford* v. *Florin Fruit Growers' Assn.,* 210 Cal. 84 [291 Pac. 170]. In that case the cooperative association illegally amended its by-laws. Thereafter, on the representation of the executive officers of the association that the illegal amendment was in effect, a member changed his position to his injury. This court held that the principles of estoppel enunciated in section 1962 (3) of the Code of Civil Procedure were properly applicable. That section in enumerating the conclusive presumptions, in subsection (3) provides: ''Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it.'' The fair, just and equitable principles therein enunciated are clearly applicable here. (See, also, *Dool* v. *First Nat. Bank of Calexico,* 209 Cal. 717 [290 Pac. 15]; *Nicholson* v. *Randall Banking Co.,* 130 Cal. 533 [62 Pac. 930]; *Creighton* v. *Gregory,* 142 Cal. 34 [75 Pac. 569].)

It should also be pointed out that in 1931 the legislature added section 345 to the Civil Code, modifying the doctrine of *ultra vires* in this state. That section provides that the statement in the articles of the objects and powers of the corporation, shall, as between the corporation and its directors, officers or shareholders, have the effect of a limitation upon the actual authority of the representatives of the corporation and then provides, ''Such limitations may be asserted in an action by a shareholder, or at the suit of the

state, to enjoin the doing or continuation of unauthorized business by the corporation and/or its officers in cases where third parties have not acquired rights thereby, or to dissolve the corporation, or in any action by the corporation or by the shareholders suing in a representative suit, against the officers or directors of the corporation for violation of their authority.

"No limitation upon the business, purposes or powers of the corporation or upon the powers of the shareholders, officers or directors, or the manner of exercise of such powers, contained in or implied by the articles . . . shall be asserted as between the corporation or any shareholder and any third person.

"Any contract or conveyance made in the name of the corporation which is authorized or ratified by the directors . . . except as their authority is limited by law . . . shall bind the corporation, and the corporation shall acquire rights thereunder, whether the contract be executed or wholly or in part executory." Even if the contract here involved were *ultra vires* the articles, under this section as it now reads, the doctrine would not be available to appellant.

Appellant strenuously contends that to apply these just and equitable statutory principles to cooperatives will have disastrous effect on the affairs of such cooperatives; that the only basis upon which a cooperative can survive is equality of treatment of all of its members. The argument is without merit. The legislature has determined otherwise. Since 1923 the legislature, acting well within its proper sphere, has determined that it is in the public interest to permit such cooperatives to enter into such contracts as are here under attack. That is a legislative policy, not a judicial one.

The other arguments urged by appellant are all without merit.

The judgment appealed from is affirmed.

Houser, J., and Langdon, J., deeming themselves disqualified, did not participate herein.

Rehearing denied.