[S. F. No. 15839.   In Bank.—April 22, 1938.]

R. M. STAFFORD et al., Respondents, v. CALIFORNIA
CANNING PEACH GROWERS (a Nonprofit Coop-
erative Association), Appellant.

Agnew & Boekel, Carroll Single and Stanley J. Cook for Appellant.

Richard W. Young, Floyd B. Cerini and F. X. Kerner, as *Amici Curiae*, on Behalf of Appellant.

Seth Millington and Jerome D. Peters for Respondents.

THE COURT.—The two respondents R. M. and H. L. Stafford are sons of T. H. Stafford. During the times here-involved the father owned a ranch in Sutter County, about 100 acres of which were devoted to the growing of canning peaches. In 1932 and prior thereto, this ranch was operated by the father and these two sons under an oral agreement to split the profits and losses. Under this agreement the ultimate control of all questions of policy involving the ranch, rested in the father, who was approaching 80 years of age.

In 1932 the father became a regular member of appellant association and entered into the usual member's marketing agreement. During the seasons 1932, 1933 and 1934 the peaches grown on the 100 acres were delivered to the association and paid for by it on the basis provided in this agreement, that is, the pooled price less 5 per cent and expenses. In 1933 one of the sons—R. M. Stafford—was elected a director of the appellant, although he was not a member of the association. The question of his qualifications as a director was discussed at various meetings of the board, but no formal action was taken in reference thereto. He participated in the deliberations of the board from December of 1933 to June of 1935.

The Staffords did not have sufficient capital to finance the ranch operations from year to year. Until the close of the peach season of 1934, and for many years prior thereto, the father had been financing operations by means of year to year loans advanced by a credit association in Marysville. There was also a deed of trust on the property. Late in the year 1934 the manager of the credit association informed the father that his association would not finance the 1935 operations as it had in the past; that because of the father's advanced age, the possibility of his death, and the difficulty of dealing with estates, the existing method of financing was not satisfactory to the credit association; that some other and different arrangement must be made in 1935.

R. M. and H. L. Stafford, and three other children of T. H. Stafford, consulted together and with their father, and with the then attorney for appellant association, as to the proper solution of their problem. It was finally agreed between the children and their father that a family corporation should be organized, and that this corporation should buy the orchard from the father. As part of this agreement it was decided that after such sale to the corporation it would be in the best interests of the corporation to withdraw from appellant association. The marketing agreement then in effect between the father and appellant expressly provided that upon a *bona fide* sale of the grower's orchard the agreement could be cancelled. The trial court found, and the finding is not challenged, that this proposed sale to the proposed corporation was *bona fide*.

Thereafter, but before the new corporation was organized, R. M. Stafford informed the general manager of appellant —A. D. Poggetto—of the proposed new arrangement, and of the fact that the corporation, when it became the owner of the ranch, intended to exercise its privilege of cancelling the marketing agreement, and that for the season of 1935 and thereafter the corporation would not sell its fruit to appellant. The appellant association desired, if possible, to retain the large tonnage produced on the Stafford ranch. After some discussion Poggetto, in an effort to retain this fruit for the association, suggested that, instead of forming a new corporation, the two sons, R. M. and H. L. Stafford, should lease the orchard from their father; that if they did so they would then be "renters", and as such eligible for admission to the association as "renter members" as defined in the 1924 resolution; that under this arrangement the association would buy the fruit for market price less 25c per ton; that if this were done the existing contract with the father would be cancelled. This plan appealed to the Staffords. The two sons thereafter secured from their father a *bona fide* written lease for the years 1935 and 1936, and the association thereupon cancelled the existing marketing agreement with the father. Before entering into a new marketing agreement the Staffords inquired as to the procedure necessary to be followed to become renter members. They were informed by Poggetto and the assistant secretary Schmitt that the practice followed by the association was to have the renter member sign a regular members contract (which was the only form available); that the association would then enter the member on its books as a renter member; that this would bring the member under the terms of the resolution of January 15, 1924, and make him a renter member. On these representations the Staffords and the association executed the new marketing agreement in February, 1935. The trial court found, and the finding is unchallenged, that these "statements made to plaintiffs by said officers were believed by said officers to be true and were made for the purpose of having plaintiffs believe same, and to induce plaintiffs to execute said agreement, and the same and each of the same were believed by plaintiffs, and if it were not for such statements and representations, plaintiffs and each of them would not have executed said marketing agreement"; that both of the parties

intended that by the signing of the marketing agreement the plaintiffs should become renter members and be paid for their fruit in accordance with the 1924 resolution; that when the agreement was executed the plaintiffs knew that in the past the association had entered into similar contracts with other renters and that the procedure followed in executing the contracts in the other cases was the same procedure followed by them; and that in the past the association had paid these other renter members in accordance with the intent and understanding of the parties.

In June of 1935, as already set forth in the Harkey case, (*California C. P. Growers* v. *Harkey, ante,* p. 188 [78 Pac. (2d) 1137]), decided this day, the association elected a new board of directors. In August of 1935 the Staffords, in company with their attorney visited the new management to ascertain their rights under their contract. The association, while not denying that a renter member contract had in fact been entered into with the Staffords, stated that it would not recognize any such renter member contracts entered into by it through its old management unless ordered to do so by a court; that the Staffords could either deliver their fruit and be paid on an owner member basis and sue the association for the difference, or refuse to deliver at all; but, if they failed to deliver, the association would sue for breach of contract and ask for 50 per cent of the market value of the crop as liquidated damages as provided in the marketing agreement.

The plaintiffs elected to and did deliver their 1935 crop to the association. They were paid only the amount per ton paid to owner members. They thereupon brought this action to reform the contract so as to have it declare the true intent of the parties, and to recover the balance due them under the contract as so reformed. The association by answer challenged plaintiffs' right to reformation, and likewise pleaded·that if the contract were not reformed, the written contract between the parties was a regular members contract, and under the parol evidence rule, proof of any oral modifications should not be permitted. The association likewise pleaded that renter member contracts are *ultra vires* and not binding on the association. The association also sought declaratory relief as to the 1936 season. This last issue was removed from consideration by a stipulation of the

parties that the Staffords would deliver their 1936 fruit to the association, and would be paid as owner or renter members depending upon the final outcome of this case.

The trial court found in favor of plaintiffs on all material issues. It ordered that the contract of February 20, 1935, should be reformed so as to call for payments as provided in the 1924 resolution, and entered its judgment accordingly. It is conceded by appellant that if the Staffords are legally entitled to be paid on a renter member basis for 1935 the amount of the judgment as fixed by the trial court is correct.

The first and main point urged by appellant is that no proper case for reformation has been presented by respondents, and that they should have been held to the terms of their written contract. It is appellant's contention that there was neither fraud, nor a mistake of law or of fact sufficient to warrant reformation. In this connection appellant seeks to bring this case within the well-settled rule that where parties reduce their agreement to writing, understand all of its terms, and are fully cognizant of its legal effect, reformation will not be granted to accord with a contemporaneous oral agreement not intended to be embodied in the written agreement and contrary thereto. (*Coneland Water Co.* v. *Nickalls,* 75 Cal. App. 212 [242 Pac. 518]; *National Bank* v. *Exchange Nat. Bank,* 186 Cal. 172 [199 Pac. 1]; *Horton* v. *Winbigler,* 175 Cal. 149 [165 Pac. 423].) That rule is not properly applicable to the facts here presented. The respondents executed the standard marketing agreement upon the representation of the executive officers of appellant that the execution of that agreement, plus the oral understanding of the parties, plus the entry on the books of respondents' names as renter members, plus the resolution of 1924, would have the legal effect of making respondents renter members within the meaning of that resolution, and entitled to payment as therein provided. The parties at the time they executed the contract may have made a mistake of law as to the legal effect of the transaction, but there is no dispute but that at that time both intended and honestly believed that the legal effect of the transaction was to entitle respondents to market price less 25c per ton for their peaches as provided in the 1924 resolution. At the moment of execution and for some time thereafter, if either of the contracting parties had been asked as to their intention and

legal relationship they would have agreed that this was their intention. The contracting parties intended that the resolution of 1924 should be and believed it was a part of their contract, and intended and believed that it should control the provisions as to amount and method of payment contained in the standard marketing agreement. There is no doubt that the mistake was a mutual one. The factual situation thus presented falls directly within the language and intent of the statutes providing for reformation, and within the cases interpreting those sections.

Section 3399 of the Civil Code provides that ''When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of the party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.'' Section 3401 of the Civil Code provides that: ''In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be.'' The principles announced in these statutes have long been the law of California without special reference to the code sections. In *Murray* v. *Dake*, 46 Cal. 644, a landlord signed a lease with his tenants which he knew expressly referred to the leased premises as ''all'' of a designated building. At the time the lease was executed the landlord refused to sign without a reservation to himself of a second floor which he contemplated adding to the building during the period of the lease. The tenants orally stated that that was their understanding of the lease, and that they agreed the lease should not cover the second story when it was built. The landlord added the additional floor and moved in, whereupon the tenants brought this action for ejectment. The landlord asked that the lease be reformed so as to express the true intent of the parties. In holding that these facts presented a proper case for reformation the court first pointed out that the evidence showed (as it does in the instant case, the trial court so finding) that had it not been for the assurances of the tenants as to their intent, the landlord would not have signed the lease, and then stated:

"It was not, however, a case of mistake as to the contents of the lease, for the defendant knew at the time what he was signing, though he may not have known the legal effect of the words used. Nor does it appear that either of the lessees had at that time any fraudulent intention to use the lease for any purpose other than what was named and agreed to"—that intent, the court pointed out, was formed later. The court continued as follows: "This presents the question whether a court of equity will interfere to prevent the fraudulent use of a paper for a purpose not contemplated at the time it was made, but where there was no mistake or fraud in its execution. There is some conflict in the authorities upon the question, but we think the better opinion is that relief will be granted." After a review of some of the cases, the court concluded that "To permit the plaintiff here to avail himself of this lease, in violation of his express agreement, to recover the property in controversy, would be to uphold and sanction fraud and bad faith."

It is true that there are cases from other states refusing reformation under such circumstances, but we think the rule of the Murray case is a proper and salutary one, and should be followed. It has frequently been approved. See particularly *Fidelity & Cas. Co.* v. *Fresno Flume etc. Co.*, 161 Cal. 466 [119 Pac. 646, 37 L. R. A. (N. S.) 322]; *Holmes* v. *Anderson*, 90 Cal. App. 276 [265 Pac. 1010].

■ The instant case presents a stronger factual situation for the application of the above rule than did the Murray case. Here both parties, it is true, knew that they were signing a contract calling for a pooled price less 5 per cent and expenses, but both honestly believed and intended that the legal effect of that instrument, when considered in view of the agreement to list respondents on the books as renter members, and in view of the resolution of 1924, was to provide for market price less 25c per ton. Both parties knew that many such contracts had been entered into by the association, and that the association always had considered that the provisions of the 1924 resolution were part of the contract, and controlled the subject of payment. This clearly constitutes a mistake of law within the meaning of section 3399 of the Civil Code, as such mistake of law is defined in section 1578 (1) of that code.

Moreover, even if the case was not one involving a mistake of law, it presents a situation where to deny reformation would be to sanction a fraud. It is true the court below made no express finding of fraud, but it did find the facts from which such fraud may be inferred. It found that the association took it upon itself to represent to respondents the legal effect and consequences of their acts. It purported to interpret the contract. This information, although given in good faith, was false. To now condone the use of the contract for purposes other than those represented would be to sanction a constructive fraud. In our opinion the trial court properly reformed the contract.

The appellant next urges that the contract as reformed is *ultra vires* and void. The trial court found it was not *ultra vires*, but also found if it were *ultra vires* appellant is estopped to deny its validity. As already held in the Harkey case, *supra*, the by-laws of the association did not authorize and in fact prohibited the type of transaction here under discussion. But as also pointed out in that case, the resolution of 1924 authorizing such transactions did not violate the articles or any principle of public policy—in fact it was in exact accord with the legislative policy of the state. As to the year 1935, which is the only year involved on this appeal, the association is not seeking to be released from an executory contract claimed to be *ultra vires*, but has insisted that respondents deliver their fruit upon threat of an action for breach of contract and of a 50 per cent liquidated damage claim. The association does not seek rescission with its consequent restoration of material benefits received by it. It is seeking to enforce the terms of the standard marketing agreement, a contract—in view of the reformation—that we must hold was never executed by the parties. What was said in the Harkey case on this phase of the controversy is equally applicable here. On the grounds therein stated it is held that appellant's contention now under discussion lacks merit.

The other points urged by appellant are without merit. For the foregoing reasons the judgment appealed from is affirmed.

Houser, J., and Langdon, J., deeming themselves disqualified, did not participate herein.

Rehearing denied.